UNITED STATES of America, Appellee,

v.

Jose GORDILS, Francisco Bastar and Nicholas Mpounas, Appellants.

Nos. 179 to 181 and 505 to 507, Dockets 90–1302L, 90–1303, 90–1304, and 92–2120 to 92–2122.

United States Court of Appeals, Second Circuit.

Argued Oct. 15, 1992.

Decided Dec. 22, 1992.

Gail Jacobs, Great Neck, NY, for appellant Bastar.

Charles T. Theofan, Mineola, NY, for appellant Mpounas.

Before: LUMBARD, ALTIMARI and McLAUGHLIN, Circuit Judges.

LUMBARD, Circuit Judge:

Jose Gordils, Nicholas Mpounas, and Francisco Bastar appeal from judgments of conviction entered on April 24, 1990, following a jury trial in the District Court for the Southern District of New York, Edelstein, J., and from the January 30, 1991 order of the same court denying the defendants' joint motion for a new trial.

The jury convicted them of conspiracy to distribute in excess of 500 grams of cocaine, in violation of 21 U.S.C. § 846; possession with intent to distribute in excess of 500 grams of cocaine and approximately 78 grams of heroin,[1] in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B) and 18 U.S.C. § 2; and using and carrying firearms during and in relation to drug trafficking crimes, in violation of 18 U.S.C. §§ 2 and 924(c). On the narcotics charges, the district court sentenced Gordils, Mpounas, and Bastar to terms of imprisonment of 151 months, 188 months, and 97 months, respectively. In addition, each defendant was sentenced to a consecutive five-year term of imprisonment on the firearms charge and to five years of supervised release. Special assessments were also imposed.

Gordils contends that the district court erred in denying his pre-trial motion to suppress certain evidence. Bastar argues that the evidence against him was insufficient to support his conviction on the firearms and heroin charges. Gordils, Mpounas, and Bastar each contend that the district court erred in denying their joint motion for a new trial. We affirm.

In early May 1989, Luis Hernandez, a confidential informant working for the DEA, telephoned Bastar and arranged a

Alexandra Rebay, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., John W. Auchincloss, II, Asst. U.S. Atty., of counsel), for appellee.

J. Jeffrey Weisenfeld, New York City (Goldberger & Dubin, P.C., New York City of counsel), for appellant Gordils.

1. Mpounas was also convicted on an additional charge of possession with intent to distribute in excess of 123 grams of heroin, arising from the seizure of heroin from his person at the time of his arrest.

meeting at a fast food stand in the Bronx. At the meeting, Hernandez offered to pay Bastar a commission if Bastar arranged for him to purchase two kilograms of cocaine. Bastar agreed to talk to his "connection" and to try to set up a meeting for Hernandez.

Several days later, on May 10, Bastar telephoned Hernandez and said he had arranged for Hernandez to meet with a dealer named "Flaco," later identified to be Gordils. They met and drove to Apartment 1A at 636 East 224th Street in the Bronx, where Bastar introduced Hernandez to Gordils and Mpounas. Soon thereafter, Gregory Melendez [2] arrived and gave some cash to Gordils. In response to Hernandez's concern about the use of firearms, Gordils explained that Hernandez need not be afraid because guns were kept in the apartment "only for protection." While Hernandez was in the apartment, several other individuals came to discuss narcotics-related business with Gordils.

Gordils, Bastar, and Hernandez went into a bedroom to discuss Hernandez's cocaine purchase. Hernandez told Gordils that his brother-in-law wanted to purchase two kilograms of cocaine. After some negotiation, Gordils and Hernandez agreed on a price of $16,200 per kilogram of high quality cocaine.

On May 14, Bastar called Hernandez to report that he and Gordils were ready to deliver the cocaine, and that Gordils was anxious to complete the deal. At the instruction of the DEA agents, Hernandez telephoned Bastar the next day and reported that he was ready to complete the transaction at the previously agreed upon location of 97th Street and Riverside Drive in Manhattan. Bastar and Hernandez arranged to meet that afternoon and go to Apartment 1A in preparation for the deal.

When Bastar and Hernandez arrived at the apartment, Gordils showed Hernandez approximately two and a half kilograms of cocaine. Under the guise of calling his brother-in-law, Hernandez made several telephone calls to DEA Special Agent Leonard Johnson and reported that there were about two and a half kilograms of cocaine in the apartment, that he and at least one of the members of the organization would be coming to 97th Street and Riverside Drive, that there were weapons in the apartment, and that he did not know whether Gordils or anyone else would be coming to the deal armed.

While Hernandez was in the apartment, another customer of the organization arrived and asked to purchase one kilogram of cocaine. Gordils and Mpounas agreed that they would sell the cocaine they had on hand to Hernandez, and they would try to obtain another kilogram for the new customer. Thereafter, Mpounas and Melendez left the apartment in search of more cocaine.

As Gordils and Hernandez left for 97th Street and Riverside Drive, Gordils instructed Bastar to wait in the apartment and not to admit anyone except Mpounas, Melendez, or another individual named "Piki." Gordils told Bastar that if the customer who had requested the kilogram of cocaine returned, Bastar should tell him to wait. Gordils also stated that after completing the sale to Hernandez, he intended to return to the apartment to count the money received from the purchase.

Gordils and Hernandez arrived at 97th Street and Riverside Drive at about 5:00 p.m. Shortly thereafter, DEA agents arrested Gordils and seized two kilograms of cocaine from the floor of his car. They then took Gordils and Hernandez to the DEA's office on West 57th Street in Manhattan, whereupon Hernandez informed the agents that: (1) Bastar had remained in Apartment 1A alone and had been instructed to admit only Gordils, Mpounas, Melendez, and Piki; (2) Bastar and perhaps oth-

---

2. Melendez was also charged with conspiracy to distribute cocaine, possession with intent to distribute cocaine and heroin, and use of a firearm in connection with a drug trafficking offense. He was tried along with Gordils, Mpounas, and Bastar, but the jury was unable to reach a ver-dict on any of the charges against him. The district court declared a mistrial as to Melendez, and he subsequently pled guilty to a superseding indictment which charged possession of cocaine.

ers were inside the apartment awaiting Gordils's return with the proceeds from the two-kilogram sale; and (3) Gordils had ordered an additional kilogram of cocaine for another customer. Because Hernandez had learned these facts after making his telephone calls to Agent Johnson, the DEA agents were learning of these developments for the first time.

Based on this new information, the agents decided to secure Apartment 1A to prevent the flight of suspects and the removal or destruction of evidence. Accompanied by Hernandez, the agents left for the Bronx without first obtaining a search warrant, arriving at 636 East 224th Street between 6:30 and 7:00 p.m. After Hernandez spotted and identified Mpounas and Melendez, the agents arrested Mpounas on the street and Melendez in the vestibule of the building.

They then went to the door of Apartment 1A, knocked, and announced in both English and Spanish, "Police, open up." No one opened the door, and when one of the agents heard shuffling noises inside, they broke down the door with a battering ram.

The agents arrested Bastar, who was sitting in a chair in the living room. Lying on the floor near the chair was a fully-loaded .9 millimeter semi-automatic pistol, its safety off and a round in the chamber. The agents conducted a security sweep of the apartment and observed in plain view one kilogram of cocaine, a quantity of heroin, approximately $9,000 in cash, drug records, a scale, glassine envelopes, and other narcotics paraphernalia. Several agents remained in the apartment while a search warrant was obtained by telephone. The warrant was executed about 10:00 p.m., whereupon the agents seized additional narcotics, narcotics paraphernalia, and firearms.

After indictment, Gordils moved to suppress the evidence seized during the war-rantless search of Apartment 1A. The government responded that the search was justified by exigent circumstances. The district court conducted an evidentiary hearing on the issue and denied the motion.

Trial began on November 28, 1989. The government presented the testimony of Hernandez and of the agents involved in the undercover operation, the arrests, and the search of Apartment 1A. The government also introduced tape recordings of telephone calls, narcotics, narcotics records and paraphernalia, and firearms. Neither Gordils, Bastar, nor Mpounas presented any evidence.[3] The jury convicted Gordils, Bastar, and Mpounas on all counts. Sentences were imposed on April 24, 1990, and these appeals followed.

On June 14, 1990, the government advised the district court and defense counsel of its recent discovery of additional criminal charges pending against Hernandez. On November 30, 1989, the second day of Hernandez's trial testimony, an indictment was filed in New Jersey Superior Court, Atlantic County, charging Hernandez with one count of theft of over $500 by deception and one count of knowingly writing a check for $9,500 drawn on insufficient funds. New Jersey authorities advised the government that the charges arose from conduct on September 17, 1989, that a bench warrant was issued when Hernandez failed to appear, and that the charges remained pending.[4]

On July 16, 1990, pursuant to a stipulation approved by us, Gordils, Bastar, and Mpounas withdrew their appeals without prejudice to restore them within 10 days of the district court's disposition of any new trial motions they might make. Thereafter, Gordils, Bastar, and Mpounas moved jointly for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. On January 30, 1992, the district court denied the new trial motion, reason-

3. Melendez called his wife to testify that he was not present in Apartment 1A on May 15, 1989.

4. The Government also informed defense counsel that on December 13, 1989, several days after the completion of trial in this case, Hernandez had been arrested and charged with Grand Larceny in the Fourth Degree of property exceeding $1,000 in value, arising from an incident which occurred on September 16, 1989. Those charges were dismissed on or about June 14, 1990.

ing that because the newly discovered evidence of Hernandez's criminal history was merely cumulative of extensive impeachment material known by the defense at the time of trial, admission of the evidence would not likely have resulted in the defendants' acquittal.[5]

### A. Denial of the Motion to Suppress

■ It is well-settled that the warrant requirement of the Fourth Amendment must yield in those situations in which exigent circumstances require law enforcement officers to act without delay. *See, e.g., Payton v. New York*, 445 U.S. 573, 585–86, 100 S.Ct. 1371, 1379–80, 63 L.Ed.2d 639 (1980). "A district court's determination as to whether exigent circumstances existed is fact-specific, and will not be reversed unless clearly erroneous." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir.1990) (en banc), *cert. denied*, — U.S. —, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991).

■ "[T]he test for determining whether a warrantless entry is justified by exigent circumstances is an objective one that turns on the district court's examination of the totality of circumstances confronting law enforcement agents in the particular case." *Id.* "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *Id.* (quoting *Dorman v. United States*, 435 F.2d 385, 391 (D.C.Cir. 1970) (en banc)).

■ We have adopted six factors as guideposts for determining the existence of exigent circumstances:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the

crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*MacDonald*, 916 F.2d at 769–70 (quoting *Dorman*, 435 F.2d at 392–93). We have consistently emphasized that these factors "are merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive." *United States v. Medina*, 944 F.2d 60, 68 (2d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992). Applying these six factors, we conclude that the district court's finding of exigent circumstances is supported by the record.

First, the ongoing sale and distribution of kilogram quantities of cocaine from Apartment 1A constituted a serious offense. *See MacDonald*, 916 F.2d at 770.

Second, Hernandez had informed the DEA agents that firearms were kept in Apartment 1A and used for protection.

Third, the agents had probable cause to believe that Gordils, his associates, and Bastar had committed and were continuing to commit large scale narcotics distribution offenses.

Fourth, the agents had reason to believe that Bastar and perhaps others were inside the apartment.

Fifth, there was a substantial likelihood that Bastar and anyone else inside the apartment might flee and escape arrest. Hernandez had informed the agents that Bastar and perhaps others were inside the apartment awaiting Gordils's return with the proceeds of the sale to Hernandez. If suspicions were aroused by Gordils's failure to return promptly, those inside the apartment were likely to flee and remove or destroy evidence.

Sixth, the agents first attempted a peaceful entry of the apartment by knocking and announcing their presence. Only when

---

5. Defense counsel were not advised of the district court's order and, consequently, did not restore their direct appeals or appeal from the denial of the new trial motion in a timely manner. On April 19, 1991, we approved a stipula-tion permitting defendants to move to restore their direct appeals. At oral argument of this appeal, we granted defendants permission to appeal out of time from the district court's denial of the new trial motion.

they received no response and heard shuffling noises inside, thus confirming their belief that someone was in the apartment, did they break down the door. *See Mac-Donald,* 916 F.2d at 770.

■ Notwithstanding the weight of these factors, Gordils contends that there were no exigent circumstances because the agents had probable cause to search Apartment 1A well before they arrested Gordils, perhaps as early as May 10, 1992, but failed to obtain a search warrant. The Fourth Amendment does not, however, "require government agents to obtain a warrant at the earliest possible moment; instead, they may wait 'until events have proceeded to a point where the agents could be reasonably certain that the evidence would ultimately support a conviction.'" *United States v. Lopez,* 937 F.2d 716, 723 (2d Cir.1991) (quoting *United States v. Miles,* 889 F.2d 382, 383 (2d Cir. 1989)). Thus, "even if the agents might have been able to obtain a warrant earlier in the day, their failure to do so at the first opportunity does not bar them from acting on an exigency that arises later." *United States v. Cattouse,* 846 F.2d 144, 147 (2d Cir.), *cert. denied,* 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988). The agents' failure to obtain a search warrant at the earliest possible time did not bar them from acting on the exigent circumstances that arose after they arrested Gordils.

■ Gordils also contends that because several hours passed between his arrest and the agents' trip to the Bronx to secure Apartment 1A, there were no exigent circumstances. Gordils overlooks, however, that only after returning to the DEA office and debriefing Hernandez did the agents learn that Bastar and others were inside the apartment awaiting Gordils's return. Only then did the agents begin to fear that Gordils's failure to return would raise sus-

picions and lead to the flight of suspects or the loss of evidence. The agents did not needlessly delay for several hours; rather, they proceeded to secure Apartment 1A as soon as they learned of the circumstances requiring their exigent action.[6]

Accordingly, the district court's finding that exigent circumstances justified the warrantless entry of Apartment 1A is supported by the record.

### B. *Sufficiency of the Evidence Against Bastar*

■ An appellant who challenges the sufficiency of the evidence to convict bears a "very heavy burden." *United States v. Scarpa,* 913 F.2d 993, 1003 (2d Cir.) (citation omitted), *cert. denied,* 498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990). A conviction must stand against such a challenge if, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The evidence was sufficient to support Bastar's conviction for use of a firearm and for possession of heroin.

#### 1. Use of a firearm

■ Title 18 U.S.C. § 924(c) provides for enhanced penalties for anyone who "uses or carries a firearm" in connection with a drug trafficking crime. To "use" a firearm within the meaning of the statute, a defendant need not fire the weapon. Rather, "use" can be established where circumstances indicate that the firearm was "an integral part of the narcotics offense and facilitated that offense." *Medina,* 944 F.2d at 66 (quoting *United States v. Alvarado,* 882 F.2d 645, 653 (2d Cir.1989), *cert.*

---

6. In light of this exigency, the agents did not act improperly in failing to obtain a telephonic search warrant. We have previously noted that "[a] reasonable period of time ... must be allowed for reaching a magistrate." *United States v. Gallo–Roman,* 816 F.2d 76, 81 (2d Cir.1987); *accord Lopez,* 937 F.2d at 723 (brief period of time required to obtain telephone warrant would have allowed defendant to escape and to destroy evidence). Here, the agents were confronted with a situation where each passing minute increased the possibility that those inside the apartment would suspect Gordils had been arrested, flee the apartment, and remove or destroy evidence.

*denied,* 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990)).

Thus, in *United States v. Meggett,* 875 F.2d 24, 29 (2d Cir.), *cert. denied,* 493 U.S. 858, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989), we found that there was sufficient evidence that the defendant had "used" a firearm, because a jury could have reasonably concluded that the five loaded firearms recovered from his apartment were on hand to protect the large quantities of narcotics kept there. We also rejected a sufficiency-of-the-evidence challenge in *Alvarado,* concluding that where three weapons and $3,000 were recovered from inside a safe, next to which lay a bullet-proof vest and a quantity of cocaine, the jury could have reasonably inferred "that the guns were located there to protect both the money and the cocaine in the event that a drug deal went sour and a buyer demanded a return of his cash." *Alvarado,* 882 F.2d at 654; *see also Medina,* 944 F.2d at 66–67. *Compare United States v. Feliz–Cordero,* 859 F.2d 250 (2d Cir.1988) (gun found inside a dresser in same room with narcotics paraphernalia did not alone constitute sufficient evidence of "use").

■ The evidence adduced at trial was sufficient for the jury to conclude that Bastar had "used" a firearm. Bastar was well aware that firearms were kept in Apartment 1A "for protection," presumably of the organization's members and property. On May 15, 1989, Bastar was left alone in the apartment, entrusted by Gordils with sole responsibility for guarding it and its contents. Although no firearms were in view when Gordils and Hernandez left the apartment, when the DEA agents entered and arrested Bastar, they found the fully-loaded, ready-to-fire pistol on the floor within Bastar's reach.[7] A jury could have reasonably inferred that Bastar had retrieved the pistol and placed it nearby for his use in protecting the apartment and its contents, including the cocaine and heroin lying in plain view. Such conduct is sufficient to constitute "use" under § 924(c).

**2. Possession of heroin**

Relying on *United States v. Burgos,* 579 F.2d 747, 749 (2d Cir.1978), Gordils maintains that because a defendant's "mere presence in the vicinity" of narcotics is insufficient evidence of possession, his conviction for possession of the heroin found in Apartment 1A cannot be sustained. The government's evidence, however, established "not mere presence, but presence under a particular set of circumstances that provided a reasonable jury with ample grounds" to conclude that Bastar possessed the heroin found in Apartment 1A. *United States v. Soto,* 959 F.2d 1181, 1185 (2d Cir.1992).

■ Possession with intent to distribute narcotics may be established by proof of the defendant's actual or constructive possession of the narcotics. *United States v. Torres,* 901 F.2d 205, 221 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). "Constructive possession exists when a person ... knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Pelusio,* 725 F.2d 161, 167 (2d Cir.1983) (quoting *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973)).

■ As noted above, the evidence showed that when Gordils and Hernandez left Apartment 1A, Gordils left Bastar alone in the apartment with sole responsibility for guarding it and its contents. When the DEA agents entered the apartment several hours later, they found heroin, glassine envelopes, diluents, and other materials used to prepare heroin for distribution lying in plain view in the living room in which Bastar was sitting. An additional quantity of heroin was discovered in the apartment's bedroom. From this evidence alone, a jury could have reasonably concluded that Bastar knowingly had the power and the intention to exercise dominion

---

**7.** One of the arresting agents testified that "the gun was on the floor. [Bastar's] hand was near it, but it was not in his hand." Trial Transcript at 636.

and control over the heroin found in the apartment.

Furthermore, in *Soto,* we ruled that where a defendant was arrested inside an apartment in which large quantities of narcotics were being packaged in plain view, the jury could infer that he was a trusted member of the narcotics organization operating from the apartment, because permitting outsiders to have such access would compromise the security of the operation. *Soto,* 959 F.2d at 1183. Here, Bastar was admitted to Apartment 1A and was left in complete control over it and its contents. Thus, a jury could have reasonably concluded that Bastar was a member of Gordils's narcotics organization and possessed the heroin found in the apartment.

### C. Denial of the New Trial Motion

 We have explained that "[a] district court must exercise 'great caution' in determining whether to grant a retrial on the ground of newly discovered evidence, and may grant the motion only '*in the most extraordinary circumstances.*'" *United States v. Imran,* 964 F.2d 1313, 1318 (2d Cir.) (quoting *United States v. Di Paolo,* 835 F.2d 46, 49 (2d Cir.1987)), *cert. denied,* —— U.S. ——, 113 S.Ct. 626, 121 L.Ed.2d 558 (1992). We will not overturn a district court's findings of fact in connection with a motion for a new trial unless clearly erroneous; nor will we reverse the denial of such a motion unless there has been an abuse of discretion. *United States v. Diaz,* 922 F.2d 998, 1006 (2d Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2035, 114 L.Ed.2d 119 (1991). The denial of the new trial motion was well within the discretion of the district court.

 Newly discovered evidence does not warrant a new trial unless the evidence is "so material and non-cumulative that its admission 'would probably lead to an acquittal.'" *United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d Cir.1992) (quoting *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980)). It is true that the newly discovered evidence could have been used by defense counsel to impeach Hernandez's credibility. As the district court found, however-

er, the new evidence was merely cumulative of other evidence of Hernandez's criminal history and past illegal conduct which was known by the defendants at the time of trial.

Specifically, defendants were aware that Hernandez had been convicted: in 1977 for attempted robbery following a jury trial in which he testified in his own defense and the jury evidently failed to credit his testimony; in 1980 for possession of a firearm; in 1986 for disorderly conduct based upon his unauthorized search for valuables left inside coats checked by patrons at an Atlantic City casino; and in 1989 for mail fraud involving the use of stolen credit cards and stolen checks totalling over $50,-000. In addition, Hernandez testified about the following criminal conduct which did not result in convictions: his extensive illegal gambling; his illegal possession of three firearms; his failure to file income tax returns at any time in his life; his 1988 arrest for impersonating a United States Postal Inspector; and his September 1989 purchase of a counterfeit DEA badge and his use of that badge to impersonate a police officer and to trick a female acquaintance into lending him $3,000 which he then lost gambling. Based on his criminal conduct, defense counsel exhaustively attacked Hernandez's credibility during cross-examination and on summation.

Because the newly discovered evidence was obviously cumulative, the district court's denial of the new trial motion was well supported by the evidence, and the district court did not abuse its discretion in denying the motion.

Affirmed.