UNITED STATES of America,

v.

Jose VELEZ and Minerva Rivera, Defendants.

No. 92–CR–278A.

United States District Court, W.D. New York.

Sept. 21, 1993.

Patrick H. Nemoyer, U.S. Atty. (Liebert F. Coppola, Asst. U.S. Atty., of counsel), Buffalo, NY, for U.S.

Edwin Gonzalez, Jeffrey A. Lazroe, Buffalo, NY, for defendants.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Carol E. Heckman pursuant to 28 U.S.C. § 636(b)(1). On February 8, 1993, defendants filed a motion to suppress evidence seized during their arrest without a warrant on September 1, 1992. On August 20, 1993, Magistrate Judge Heckman filed a Report and Recommendation recommending that defendants' motion be granted.

This Court, has carefully reviewed Magistrate Judge Heckman's Report and Recommendation and the full record, and no objections having been timely filed to the Magistrate Judge's Report in the above-captioned matter, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge Heckman's Report and Recommendation, defendants' motion to suppress is granted.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

This matter was referred to the undersigned by the Hon. Richard J. Arcara, to hear and report, in accordance with 28 U.S.C. § 636(b). Defendants have moved to suppress evidence seized during their arrest without a warrant on September 1, 1992. An evidentiary hearing was held on March 3, 16 and 18, 1993. For the following reasons, Defendants' motion should be granted.

### BACKGROUND

On August 28, 1992, acting on a tip from an informant, Buffalo Police Detective James Krause purchased two glassine bags containing a white powder, later determined to be heroin, from Defendant Jose Velez at 25 Mariner Homes, Buffalo, New York (T2, pp. 130–35).[1] Krause's entry into the apartment was observed from a distance by Detectives Grisanti and Clementi, who were parked in a surveillance vehicle on the street outside (T2, p. 131). Krause was also wearing a hidden microphone, which Detectives Grisanti and Clementi used to monitor, but not record, his conversations with the Defendants. While inside the small foyer of the Mariner Homes residence, Krause observed Velez enter the kitchen and retrieve the two small glassine bags from a brown pouch on top of the refrigerator (T2, pp. 132–33). Krause gave Velez $40.00 for the two bags (T2, p. 133). Velez, a native of Puerto Rico, speaks no English. Krause speaks no Spanish. The two communicated largely with hand signals.

On August 31, 1992, again under the observation of Detectives Grisanti and Clementi, Detective Krause returned to the same address and purchased one glassine bag containing a white powder, later determined to be heroin, from Defendant Velez for $20.00 (T2, pp. 135–36). On this visit, Krause observed Defendant Minerva Rivera reach in the pocket of her dress and take out a brown pouch from which she retrieved the glassine

bag (T2, pp. 137–38). Krause recognized the pouch as the same one he had observed Velez retrieve from the top of the refrigerator the night before (T2, pp. 138–39). After hearing Defendant Rivera speak broken English, Krause inquired about the possibility of returning the next night to purchase twenty more bags of heroin. The Defendants spoke to each other briefly in Spanish, and Rivera informed Krause that he could come back the next night to purchase twenty bags for $300.00 (T2, p. 139).

Krause returned to 25 Mariner Homes in the early evening of September 1, 1992, accompanied by a surveillance team which included Detectives Grisanti, Clementi, Niemann and Wells (T2, pp. 140–41). Krause knocked on the door, and was let in by Velez. They proceeded to the kitchen where, in the presence of another individual later identified as Wilson Velasquez, Velez produced eighteen glassine bags containing a white powder. Rivera then entered the kitchen and produced two more bags from the brown pouch in her dress pocket. Krause gave Velez $300.00, and left the residence. As he left, the door closed behind him (T2, pp. 142–48).

Detectives Niemann and Wells were waiting around the corner of the Mariner Homes building. As before, Detectives Grisanti and Clementi were in the surveillance van parked on the street approximately 50 yards from the apartment. When the officers saw Krause emerge, they met together briefly and decided to enter the apartment. Krause then approached the 25 Mariner Homes residence again, and knocked on the door. Velez came to the door, and Krause indicated to Velez that he had a problem with the purchase. As soon as Velez opened the door, Krause pushed his way inside. Detectives Niemann, Wells, Grisanti and Clementi rushed into the residence behind Krause, identifying themselves as police officers. Each of the officers but Krause was armed and wearing a bullet-proof vest plainly identifying them as Buffalo Police narcotics officers (T2, pp. 150–51; T3, pp. 16–17).

1. References are to pages of the transcripts of the evidentiary hearing held on the instant motion. "T1" refers to the transcript of the proceedings on March 3, 1993; "T2" refers to the transcript

of the proceedings on March 16, 1993; and "T3" refers to the transcript of the proceedings on March 18, 1993.

As he was entering, Krause grabbed Velez by the arm and took him into the kitchen. Velez did not resist. Krause ordered the other officers to search Rivera for drugs. Detective Niemann immediately ran upstairs, reacting to what he believed was the sound of footsteps. He saw a .22 caliber rifle propped against a wall in a bedroom. Niemann retrieved the rifle and determined that it was not loaded. He searched the bedroom closet and looked under the bed, but observed no other weapons or suspects. Niemann then went back downstairs to assist the other officers (T2, pp. 110–14).

Detectives Grisanti, Clementi and Wells had rushed into the living room, where they encountered Rivera and Velasquez, who offered no resistance. Grisanti ordered Velasquez to get down on the floor in the middle of the room. Rivera was seated on a couch which was situated against one wall, and Clementi ordered her to remain seated. Clementi conducted a search of Rivera's person, and searched the immediate vicinity where Rivera was seated, but found nothing. Clementi then searched the living room, which was described as approximately fourteen by sixteen feet in size. Directly across from the couch where Rivera was seated, at a distance of approximately twelve feet, was a sliding glass door. The door was covered by drapes or vertical blinds which extended to approximately six inches from the floor. Clementi found a brown pouch on the floor underneath, but not concealed by, the drapes. Krause identified the pouch as the one from which Rivera had retrieved drugs during the previous transactions. Clementi opened the pouch and found sixteen glassine bags containing white powder, later determined to be heroin (T1, pp. 23–27).

While Clementi was searching the living room, Krause conducted a search of the kitchen. Velez remained seated at the kitchen table, under watch by another officer. Krause looked on top of the refrigerator, and began opening cabinets. He opened a cabinet above the stove and observed a brown paper bag. Krause touched the bag and felt the shape of a handgun. He opened the bag and removed a loaded .32 caliber pistol (T2, pp. 153–54; T3, pp. 22–23).

At no time during the arrest or during any previous transaction did Krause or the other officers observe Velez, Rivera or Velasquez carrying a firearm.

Velez, Rivera and Velasquez were arrested and charged with various drug-related felonies under state law. Those charges were eventually dropped in favor of presentment to a federal grand jury. On November 6, 1992, Velez, Rivera and Velasquez were indicted on charges of distribution of heroin, possession with intent to distribute heroin, and conspiracy to possess and distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and use and possession of firearms in relation to drug trafficking, in violation of 18 U.S.C. §§ 924(c) and 2.

Velez and Rivera move to suppress the drugs and weapons seized during their arrest on the ground that the warrantless entry by the arresting officers was unjustified since they had sufficient opportunity to obtain a warrant but failed to do so. The government contends that exigent circumstances required the officers to act without delay, justifying the warrantless entry, security sweep, and seizure of evidence in plain view.

### DISCUSSION

■ A warrantless entry may be justified by exigent circumstances where the law enforcement agents were confronted by an urgent need to render aid or take action. *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990) (en banc), *cert. denied,* 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991); *Dorman v. United States,* 435 F.2d 385, 391 (D.C.Cir.1970) (en banc). The test for determining whether exigent circumstances existed sufficient to justify warrantless entry "is an objective one that turns on the district court's examination of the totality of the circumstances confronting law enforcement agents in the particular case." *United States v. MacDonald, supra.*

■ The Second Circuit has adopted the factors set forth in *Dorman v. United States, supra,* as guideposts for determining the existence of exigent circumstances. Those factors include:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. MacDonald, supra,* 916 F.2d at 769–70 (quoting *Dorman,* 435 F.2d at 392–93). These factors are illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive. *United States v. Gordils,* 982 F.2d 64, 69 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993); *United States v. Medina,* 944 F.2d 60, 68 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992).

■ Applying these factors to the instant case, and considering the totality of the circumstances confronting the officers at the time of their entry of the 25 Mariner Homes residence, I find that exigent circumstances were not present. First, the ongoing sale and distribution of narcotics is undeniably a serious offense. *See, e.g., MacDonald, supra,* 916 F.2d at 770; *Gordils, supra,* 982 F.2d at 69. However, the three "buys" were for $40.00, $20.00 and $300.00, respectively. The total amount of heroin seized from the residence consisted of approximately forty small glassine bags with a street value of no more than $800.00. No one was observed consuming drugs, and no cash, weapons or drug paraphernalia was observed.

This is in stark contrast to the facts in the *MacDonald* and *Gordils* cases relied on by the government. In *MacDonald,* the undercover agent observed a cocked 9mm semi-automatic weapon pointed at the agent within easy reach of one of the occupants, a stack of money being counted by another one of the occupants, large quantities of cocaine and marijuana, and the smell of marijuana smoke. 916 F.2d at 768. In *Gordils,* the agents seized several firearms and at least a kilogram of cocaine and 123 grams of heroin, along with drug records, drug paraphernalia and $9,000.00 in cash. 982 F.2d at 66, 68.

Second, none of the arresting officers can assert a basis for reasonably believing that the suspects were armed or dangerous, or that the suspects had access to loaded weapons. No weapons were observed during any of the transactions (T3, p. 35), and none of the suspects exhibited any violent behavior. To the contrary, the record is undisputed that each of the three buys was peaceful, took a very brief period of time, and the conversation was limited due to the Defendants' lack of command over the English language. Krause was never threatened, either by words or conduct. Indeed, Krause testified that he did not consider the offense to be a violent one (T3, p. 6). In contrast to *MacDonald,* there was no "clear and immediate threat of danger to law enforcement agents and to the public at large." 916 F.2d at 773.

Nevertheless, the government contends that exigent circumstances existed based on the violent nature of narcotics violations in general. The government relies on *United States v. Cattouse,* 846 F.2d 144 (2d Cir.), *cert. denied,* 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988), in which the Second Circuit observed that "narcotics dealers are frequently armed." *Id.* at 146. While this may be true, there is no factual basis supporting such a finding in this case. Given in addition the small quantities of narcotics involved, the absence of loaded weapons and no evidence of ongoing drug use by the suspects themselves, the threat in this case would appear to be minimal.

As to the third and fourth factors, it is conceded that the officers had probable cause to believe that the suspects had committed the crimes charged and that the suspects were on the premises.

The principal dispute centers around the fifth factor. The government argues that the suspects would have escaped or destroyed evidence if not swiftly apprehended. According to the government, Detective Krause observed additional narcotics in the residence when he made the purchase on September 1, making it likely that the suspects would destroy evidence if there was a delay in their

re-entry in order to obtain a warrant or if the officers knocked and announced that they had a warrant. The government also argues that since law enforcement agents, plainly identified by their bullet-proof vests, had already gathered outside the building, the suspects might have observed the officers at some point prior to their entry, or neighbors might have alerted the suspects to the officers' presence, thereby increasing the likelihood that evidence would be destroyed.

■ These arguments are not supported by the record. There is no *per se* rule requiring a finding of exigent circumstances merely because the case involves narcotics which could be destroyed. As mentioned above, each case turns on an objective determination of exigent circumstances based on the facts confronting the officers at the time of the entry. Here, the government can point to no evidence which might indicate that any of the suspects were aware of police presence prior to the officers' entry (T3, p. 36). Krause returned and was allowed to enter to the same residence on three separate occasions over the course of five days, indicating that the Defendants did not suspect Krause of being a police agent and were not likely to move their small-scale operation elsewhere during the time it would have taken to obtain a warrant. Indeed, Krause himself testified that he had no reason to believe that the defendants suspected that he was an undercover officer, or that other officers were present outside the residence (T3, pp. 14–15, 17).[2]

It is also undisputed that the police officers, after the second buy, and in anticipation of a third buy, had an ample basis for obtaining a search warrant. Indeed, the officers planned to arrest the Defendants and to conduct a search after the third buy was completed (T3, p. 13). Detective Krause testified without equivocation that he could have obtained a search warrant after the second buy (T3, p. 12). No justification was presented to the Court for the officers' failure to do so. In fact, the intended arrests went exactly according to plan. This tends to contradict the government's claim of exigent circumstances.

The government's theory as to likely destruction of evidence likewise does not withstand scrutiny. If a search warrant had been obtained in advance of the third buy, there would have been no delay between the time Detective Krause completed his third purchase and a search of the home. Furthermore, if the warrant were a "no knock" warrant, the officers would have been able to enter without first announcing their presence and their purpose.

The government's argument as to likely escape of the Defendants is likewise not supported by the record. The testimony was undisputed that Detective Krause was not concerned about the suspects escaping (T3, p. 14–17, 34).

Turning, then, to the sixth and final factor, the hearing testimony established that the entry itself was forced. After the door closed behind him, Krause immediately conferred with Niemann and Wells, and knocked on the door again. When Velez appeared, Krause indicated that something was wrong with the transaction he had just completed. Krause did not identify himself as a police officer before he grabbed Velez by the arm and pushed his way into the residence followed by four other police officers. Indeed, Officer Clementi testified that the entry was a forcible one (T1, pp. 49–50). Under these circumstances, this court cannot find that the officers attempted the "peaceful entry" contemplated by *Dorman,* 435 F.2d at 393, and *MacDonald,* 916 F.2d at 771.

■ Relying on the *MacDonald* case, the government next argues that Krause would

---

2. Detective Krause testified at one point that he believed "the whole neighborhood" knew that the officers in bullet-proof vests were outside the apartment (T3, p. 15). However, when pressed as to the basis for this testimony, Detective Krause could provide none. He testified that it was approximately 10:00 p.m. at night, that it was dark outside, that he saw no one on the street and that the occupants of the apartment had *not* been alerted to his undercover role or to police presence (T3, pp. 13–17, 36). Accordingly, I do not find credible the general statement that the "whole neighborhood" knew of the police presence. As clearly demonstrated by the cross examination of Detective Krause based on his grand jury testimony, Detective Krause frequently gave inaccurate and inconsistent testimony, and was not a credible witness.

**642**

have been entitled to arrest the suspects in the apartment at the time of the purchase. According to the government, it therefore follows that the undercover agent did not need a warrant to re-enter the apartment with reinforcements.

This argument confuses two separate exceptions to the warrant requirement: consent and exigent circumstances. Having probable cause for arrest, Krause could indeed have arrested the Defendants when he was in the apartment making an undercover buy. This is because he was lawfully in the apartment by reason of Defendants' consent. *Payton v. N.Y.*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Draper v. U.S.*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). However, once Krause left the apartment, he no longer had the Defendants' consent to re-enter. Accordingly, the government cannot rely on the consent exception to the warrant requirement to justify the entry and the search.

The analysis then must necessarily return to exigent circumstances. Based on the totality of the circumstances presented, the court cannot find that the government has met its burden of demonstrating that the law enforcement agents were confronted by an urgent need to make immediate entry into the 25 Mariner Homes residence.

Accordingly, the "exigent circumstances" exception to the fourth amendment's warrant requirement does not apply to justify the officers' warrantless entry of 25 Mariner Homes on September 1, 1992. In light of this finding, the court declines to address the government's contention that the evidence was properly seized as within the scope of a protective sweep, within the suspects' immediate control, or in plain view. The rifle, handgun and narcotics discovered subsequent to the warrantless entry should therefore be suppressed. *Coolidge v. New Hampshire*, 403 U.S. 443, 478, 91 S.Ct. 2022, 2044, 29 L.Ed.2d 564 (1971); *United States v. Segura*, 663 F.2d 411, 417 (2d Cir.1981), *aff'd on other grounds*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

*CONCLUSION*

For the foregoing reasons, I recommend that Defendants' motion be granted.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 30(a)(3).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Wesolek, et al. v. Canadair Ltd., et al., 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.*

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the government and the Defendants.

**So Ordered.**