UNITED STATES of America

v.

Eric ZUBER.

Crim. No. 95–07–01.

United States District Court,
D. Vermont.

Aug. 18, 1995.

190

Peter W. Hull, Assistant U.S. Attorney, Burlington, VT, for the Government.

Ernest M. Allen, III, Burlington, VT, for defendant.

### OPINION–ORDER

MURTHA, Chief Judge.

On May 22, 1995, Defendant Eric Zuber filed a Motion to Dismiss and a Motion to Suppress. The United States filed opposition to both Motions, and the Court heard oral argument on the matter at a hearing on August 7, 1995. Having reviewed the respective positions of the parties, the Court now makes the following Findings of Fact and Conclusions of Law.

### I.  FINDINGS OF FACT

This case began with an investigation that the United States Drug Enforcement Administration ("DEA") conducted during the Spring and Summer of 1991 into James Temple's involvement in cocaine distribution in the Burlington, Vermont area. DEA Special Agent Rick Carter made five controlled purchases of cocaine from Temple between April 23, and July 18, 1991. Carter arrested Temple after the final purchase on July 18, and Temple then identified the Defendant, Eric Zuber, as the source of the cocaine which Temple had been distributing. Temple agreed to cooperate with the DEA's investigation by making controlled purchases of cocaine from Zuber.

While cooperating with the DEA, Temple made controlled purchases of cocaine from Zuber on July 23 and July 24. Temple informed Carter that Zuber planned to receive another shipment of cocaine shortly. Agent Carter testified at the hearing that he expected the next shipment to arrive on Friday, and that when it did he anticipated arresting Zuber after Temple made another controlled purchase. Carter contacted DEA Special Agent Doud and apprised him of the status of the investigation, including his plan to arrest Zuber when the next shipment of cocaine arrived.

Temple maintained contact with both Zuber and Carter during the next three days, and at approximately 11:00 a.m. on Saturday, July 27, Temple telephoned Carter and told him that Zuber had received the cocaine. Carter contacted Doud and informed him that he planned to follow Temple to Zuber's residence for the purchase, determine if there was additional cocaine present, and then arrest Zuber.

Carter, Doud, and three other DEA agents assembled at the DEA office at approximately 12:00 p.m. The agents discussed their plan for the operation with Temple, who was

also present, and they outfitted Temple with a wire so that his contact with Zuber could be monitored. The group then left for Zuber's residence in 4–5 separate cars at approximately 1:45 p.m.

Followed by the agents, Temple drove from Burlington to Zuber's residence in Hinesburg, where Zuber lived with his mother Mary Zuber on an unpaved, dead-end road near Lake Iroquois.[1] When they arrived, Temple entered Zuber's residence to make the controlled purchase. Carter monitored the transmissions from Temple's wire while the remaining agents patrolled the area in their vehicles. Inside the house, Zuber told Temple that he had four ounces of cocaine and that he would sell two of them to Temple. Zuber also indicated that he planned to leave the residence shortly to distribute more of the cocaine.

After being in the house for approximately fifteen minutes, Temple left and met Carter at a nearby fishing access. Carter took the two ounces of cocaine from Temple, searched him, and then debriefed him. Temple informed Carter that Zuber had two more ounces of cocaine and was planning to leave the house shortly, and that there were other people in the house. Carter radioed Doud, summarized the situation for him, and indicated that the agents should prevent Zuber from leaving and arrest him as soon as possible.[2] Carter then drove to Zuber's residence.

In the meantime, Agent Doud contacted the other agents and prepared to approach the Zuber residence. Armed with semi-automatic pistols and service revolvers, the agents donned flak jackets and surrounded the house. Agent Doud approached the front entrance with two agents while the third agent guarded the rear door to insure that no one left unnoticed.

Agent Doud proceeded to the entrance first, knocked on the door, and saw Mary Zuber walk in his direction. Doud then opened the door himself, and the three agents entered the house with their guns drawn. Doud identified himself and explained the purpose of the entry while the other agents searched the house for Zuber and the other occupants.

After attempting unsuccessfully to calm Mrs. Zuber, Doud went upstairs and saw that the other two agents had secured Zuber and another man, Chris Lavigne. Both Zuber and Lavigne were lying on the floor on their stomachs with their hands cuffed behind their backs. Zuber's girlfriend, Terri Baker, was also present.

At this time, Agent Carter arrived at the Zuber residence. Carter went upstairs with his weapon drawn, and then holstered it when he saw that the area was secured. He took Zuber into a bedroom and explained to him that Temple had been wearing a wire and that Zuber would be charged with cocaine distribution. Zuber then retrieved the two additional ounces of cocaine he had and turned them over to Carter. At that point, Agent Carter read Zuber his *Miranda* rights. Zuber acknowledged that he understood his rights and that he was willing to cooperate. Zuber then made a detailed statement in which he acknowledged distributing wholesale quantities of cocaine on an ongoing basis.

After Zuber gave his statement, he and Baker were placed under arrest and brought to the DEA office in Burlington. The agents did not detain Lavigne, and they later released Baker without filing charges against her. At the DEA office, Zuber gave another statement describing his cocaine distribution activities. Zuber was later charged with cocaine distribution and with possession of cocaine with the intent to distribute.

## II. CONCLUSIONS OF LAW

### A. MOTION TO DISMISS

The Defendant argues that the DEA agents used Temple in a manner that was so

1. Agent Carter testified at the hearing that he was aware that the Zuber residence was located on a dead-end road.

2. There is some confusion over the precise instructions that Carter gave Doud. Agent Carter testified that it was his understanding that Zuber would not be arrested unless he left the house. Agent Doud testified that he understood Carter to mean that Zuber should be arrested right away, whether he had left the house or not.

coercive toward Zuber that it rose to the level of outrageous government conduct, violating Defendant's due process rights and requiring dismissal of the charges against him. The Government contends that Zuber's due process rights were not violated because Temple never coerced Zuber into making the cocaine sales.

■■ The Government's use of an informant may be so coercive toward a defendant that it constitutes outrageous government conduct and violates due process. *Hampton v. United States*, 425 U.S. 484, 493, 96 S.Ct. 1646, 1651, 48 L.Ed.2d 113 (1976); *United States v. Myers*, 692 F.2d 823, 837, 842–43 (2d Cir.1982). In the present case, however, Temple had only been involved with the investigation since his own arrest, which was slightly more than a week before Zuber's arrest. Defendant then assisted the agents during the ensuing week by maintaining contact with Zuber and by making controlled purchases from him. There is no evidence suggesting that Zuber's decision to sell cocaine to Temple was coerced in any way. The use of an informant as a facilitator in this manner is fully consistent with due process. *United States v. Romano*, 706 F.2d 370, 372–73 (2d Cir.1983). Consequently, Defendant's Motion to Dismiss must be DENIED.

## B. MOTION TO SUPPRESS

### 1. Fifth Amendment Claim

Defendant claims that all the statements he gave at his residence and at DEA headquarters must be suppressed because he never validly waived his *Miranda* rights. The Government contends that Zuber was fully advised of his *Miranda* rights and that he then voluntarily and validly waived them.

■■ The Court finds that the Defendant knowingly and voluntarily waived his *Miranda* rights when he stated that he understood his rights under *Miranda* and that he was nevertheless willing to fully cooperate with the investigation. Defendant himself admits he acknowledged that he understood his *Miranda* rights because he had been arrested before. Defendant's Motion to Suppress at 2. This acknowledgment, in conjunction with the agent's full explanation to Defendant of his *Miranda* rights, is sufficient to render Defendant's waiver valid. *See North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979); *Tague v. Louisiana*, 444 U.S. 469, 471, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980) (per curiam).

■■ Since Defendant was informed of his rights under *Miranda* and chose to waive them, the Fifth Amendment does not require suppression of the statements he made at his home and at DEA headquarters. Consequently, Defendant's Motion To Suppress on Fifth Amendment grounds is hereby DENIED.

### 2. Due Process Claim

Defendant claims that all the statements he gave at his home and at the DEA office must be suppressed because they were involuntarily made and thus violated his due process rights. The Government contends that no due process violation occurred because Defendant provided his statements voluntarily.

■■ The Due Process Clauses of the Fifth and Fourteenth Amendments bar the admission of involuntary confessions. *Spano v. New York*, 360 U.S. 315, 324, 79 S.Ct. 1202, 1207–08, 3 L.Ed.2d 1265 (1959). In order for a statement to be involuntary for due process purposes, it must be the product of government coercion. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986). Government coercion is typically manifested by such conduct as threatened or actual use of violence, *Brown v. Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 465, 80 L.Ed. 682 (1936), use of psychological pressure, *Spano*, 360 U.S. at 323, 79 S.Ct. at 1207, promises of leniency, *Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963), or government deception. *Arizona v. Fulminante*, 499 U.S. 279, 287–88, 111 S.Ct. 1246, 1252–53, 113 L.Ed.2d 302 (1991); *Leyra v. Denno*, 347 U.S. 556, 558–61, 74 S.Ct. 716, 717–19, 98 L.Ed. 948 (1954). Whether a statement is voluntary depends upon an examination of the totality of the circumstances in which the statement was

given. *Fulminante,* 499 U.S. at 285, 111 S.Ct. at 1251.

■ Analyzing the totality of the circumstances in the present case, the Court finds that the Defendant offered his statements voluntarily. Although the circumstances may not have required the agents to be as aggressive as they were, their conduct was entirely directed toward securing the premises and making an arrest. The agents did not threaten Zuber in any way, and they made no attempt to pressure him into confessing. Rather, the agents provided Defendant with his *Miranda* rights, he agreed to cooperate, and he then gave a statement detailing his involvement with cocaine distribution. In the absence of government coercion, a statement given under these circumstances is fully voluntary.

Since Defendant's inculpatory statements were voluntarily made, their admission does not violate due process. Consequently, Defendant's Motion To Suppress on Due Process grounds is hereby DENIED.

### 3. Fourth Amendment Claim

■ It is well established that "(t)he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990) (citing *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)).[3] *See also United States v. Deutsch,* 987 F.2d 878, 883 (2d Cir.1993) (citing *United States v. Campbell,* 581 F.2d 22, 25 (2d Cir.1978) (in the absence of exigent circumstances, warrantless entry of law enforcement officers into the private home of a suspect for the purpose of making an arrest is barred by the Fourth Amendment)). The rule prohibiting warrantless entries into the home applies even if there is probable cause to arrest the suspect. *Minnesota v. Olson,* 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990). Thus, when government authorities enter a person's home, the warrant requirement imposed by the Fourth Amendment will only yield when "exigent circumstances require law enforcement officers to act without delay." *United States v. Gordils,* 982 F.2d 64, 69 (2d Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993).[4]

The warrantless entry rule articulated by the Supreme Court in *Payton* is premised on the fact that " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Payton,* 445 U.S. at 585–86, 100 S.Ct. at 1379–80 (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). As the Court noted in *Payton,* the protections afforded by the Fourth Amendment embody the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." 445 U.S. at 601, 100 S.Ct. at 1387.

■ This traditional respect for the home is manifested in the warrant requirement of the Fourth Amendment, which guards against unnecessary intrusions into private dwellings by requiring that an "impartial magistrate determine from an affidavit showing probable cause whether information possessed by law-enforcement officers justifies the issuance of a search warrant." *Jones v. United States,* 357 U.S. 493, 498, 78 S.Ct. 1253, 1256, 2 L.Ed.2d 1514 (1958).[5] *See also*

---

**3.** The Fourth Amendment provides, in pertinent part, that "(t)he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. Amend. IV.

**4.** The Court notes that the Fourth Amendment's prohibition of warrantless entries also does not apply in situations where the property owner has consented to the entry. *Rodriguez,* 497 U.S. at 181, 110 S.Ct. at 2797 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)); *United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995). This is not an issue in the present case, however, because it is not alleged that anyone in the Defendant's house consented to the agents' entry.

**5.** As Justice Harlan eloquently explained in *Jones,* "(w)ere federal officers free to search without a warrant merely upon probable cause ..., the provisions of the Fourth Amendment would become empty phrases, and the protection it affords largely nullified." 357 U.S. at 498, 78 S.Ct. at 1257.

*Welsh v. Wisconsin,* 466 U.S. 740, 748–49, 104 S.Ct. 2091, 2096–97, 80 L.Ed.2d 732 (1984). The warrant requirement is grounded upon the principle that a neutral judicial officer is better able to make an objective and detached analysis of the evidence proffered by the government in support of its warrant application than are the government officers who are themselves actively engaged in the investigation. *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948).[6] The Second Circuit reiterated these principles when it observed that

> (t)o be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.

*United States v. Reed,* 572 F.2d 412, 423 (2d Cir.1978). Because of the exceptionally high privacy interest that our society recognizes in one's personal dwelling, the *Payton* Court "drew a line at the entrance to the home," *Harris,* 495 U.S. at 18, 110 S.Ct. at 1643, and barred the government from crossing that line without either a warrant or exigent circumstances.

Where, as here, the Government argues that a warrantless arrest was necessitated by exigent circumstances, the Government bears the burden of establishing by a preponderance of the evidence that such circumstances did, in fact, exist. *Payton,* 445 U.S. at 590, 100 S.Ct. at 1382. As the Supreme Court has indicated, "(b)efore agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh,* 466 U.S. at 750, 104 S.Ct. at 2098. Thus, warrantless home entries carry with them a presumption of unreasonable-

ness, and the "police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Id.* at 749–759, 104 S.Ct. at 2096–2103. *See also United States v. Acosta,* 965 F.2d 1248, 1251 (3d Cir.1992).

In the Second Circuit, "the test for determining whether a warrantless entry is justified by exigent circumstances is an objective one that turns on the district court's examination of the totality of the circumstances confronting law enforcement agents in the particular case." *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.) (en banc), *cert. denied* 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1990). The essential question in this test is "whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *Id.* (quoting *Dorman v. United States,* 435 F.2d 385, 391 (D.C.Cir.1970) (en banc)). The Second Circuit has adopted a six-factor analysis to aid the Court's determination of whether the Government's need was sufficiently urgent to constitute exigent circumstances: (1) the gravity or violent nature of the offense charged; (2) whether there is a reasonable belief that the suspect was armed; (3) a clear showing of probable cause to believe the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry. *Gordils,* 982 F.2d at 69 (citing *MacDonald,* 916 F.2d at 769–70). These six factors "are merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive." *Id.* at 769–70 (quoting *United States v. Medina,* 944 F.2d 60, 68 (2d Cir. 1991)). When these principles are applied to the present case, the Court finds that there were clearly no exigent circumstances that justified the warrantless entry into the Defendant's home.

The Court observes preliminarily that the circumstances surrounding Defen-

---

**6.** Writing for the Court in *Johnson,* Justice Jackson concluded that "(a)ny assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search with-

out a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." 333 U.S. at 14, 68 S.Ct. at 369.

dant's arrest provided the Government with a very clear picture of the situation at Defendant's home on July 27, 1991. Agent Carter met with Temple, who was cooperating with the Government, only a few minutes after Temple had left the Defendant's house. During this exchange Carter had an opportunity to question Temple extensively, and the Government was therefore provided with a detailed and contemporaneous description of the precise situation at the Defendant's home. After Temple described the scene at Defendant's house to Carter, Carter summarized that information to Doud on the radio before the agents approached and entered the house.

Because Temple had just provided them with this information, the Government agents knew that the Defendant was unarmed and that there were apparently no weapons in the house. The agents were thus aware that the operation posed no serious danger to them or to anyone else in the house.

Although the Government argues that their warrantless entry was justified to prevent the removal of the cocaine, the agents were fully aware it was unlikely the Defendant would escape with the drugs if he was not immediately arrested. Temple gave no indication to Carter that Zuber suspected an arrest was imminent or that he was a risk of flight. More importantly, agent Carter correctly believed that Zuber lived on a dead-end street, and the only road away from Zuber's house was closely guarded by a half-dozen DEA agents. When the agents approached the house they essentially surrounded it and covered each door, again cutting off any avenue of escape. Consequently, there was no threat of escape or removal of evidence that provided the agents with the authority to force their way into Zuber's home without a warrant and arrest him.

The Court finds it relevant that the Government had ample time within which to secure a warrant, but chose not to do so. Agent Carter testified at the hearing that, during the days before the arrest, he anticipated using Temple to make a controlled cocaine purchase that would result in Zuber's arrest. Agent Carter expected Zuber to receive the shipment of cocaine at any time,

and he planned to initiate the operation by following Temple to Zuber's home with a team of agents as soon as the drugs arrived. There was time during which a warrant could have been prepared and sought.

This same analysis applies to the day of the arrest. Temple alerted Carter that the drugs had arrived at approximately 11 a.m., and Carter then contacted Doud to tell him that the plan to make a controlled purchase was ready for execution, and that he anticipated arresting Zuber. The team of agents then assembled at the Burlington DEA office with Temple to prepare for the operation. They did not depart for Zuber's until approximately 1:45 p.m., so the government agents had nearly three hours during which they could have telephoned a judicial officer and obtained a warrant.

██  It is true that Carter's discussion with and search of Temple just prior to the raid confirmed that Zuber was in the house and that he had sold cocaine to Temple. In addition, there is no doubt that distributing cocaine is a serious offense. *See Mac-Donald*, 916 F.2d at 770. Under these circumstances, however, the Court finds that the gravity of the Defendant's offense and the Government's knowledge of his presence at the house is outweighed by the serious constitutional violation committed by the agents when they conducted a warrantless assault on the home of an unarmed suspect who posed no apparent threat of escape. Because no exigent circumstances existed to justify it, this warrantless entry violated the Defendant's Fourth Amendment right to be secure in his home from unreasonable searches and seizures.

██  The exclusionary rule generally prohibits the introduction at trial of evidence that has been obtained in violation of the Fourth Amendment. *Rodriguez*, 497 U.S. at 183, 110 S.Ct. at 2798. *Mapp v. Ohio*, 367 U.S. 643, 652, 81 S.Ct. 1684, 1690, 6 L.Ed.2d 1081 (1960). With respect to violations of *Payton*, "a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home." *New York v. Harris*, 495 U.S. 14, 20, 110 S.Ct. 1640, 1644, 109 L.Ed.2d 13 (1990). Consequently, the

Court must suppress any evidence taken by the agents at Defendant's home, including the two bags of cocaine, as well as all statements that the Defendant made there to the agents.

The Court must apply a balancing test in resolving the tensions between the actions of police officers and the rights that the Constitution secures for all citizens. The Supreme Court took note of these competing interests when it observed that

> (c)rime, even in the privacy of ones own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Johnson,* 333 U.S. at 14, 68 S.Ct. at 369. Thus, the Fourth Amendment resolves the tension between security and liberty by requiring government officers to secure a warrant before entering a person's home.

Because the Government failed to do so in the present case, Defendant's Motion to Suppress on Fourth Amendment grounds is hereby GRANTED. All evidence taken by the agents at Defendant's home, including the two ounces of cocaine, and all statements that the Defendant made there to the agents, shall be excluded at Defendant's trial.

### III. CONCLUSION

Based upon the foregoing analysis, the Court hereby:

1. DENIES Defendant Eric Zuber's Motion to Dismiss dated May 22, 1995; and
2. GRANTS IN PART and DENIES IN PART Defendant Eric Zuber's Motion to Suppress dated May 22, 1995. Defendant's Motion to Suppress is DENIED with respect to his Fifth Amendment and Due Process claims. Defendant's Motion to Suppress is GRANTED with respect to his Fourth Amendment claim.

All evidence taken by the Government at the Defendant's home on July 27, 1991, including the two ounces of cocaine and all statements that the Defendant made there to the agents, shall be excluded at Defendant's trial.

SO ORDERED.