Louise THORNTON, as Administratrix
of the Estate of Jessie Lee Davis,
deceased, Plaintiff,

v.

The CITY OF ALBANY, Sergeant David
Aloisi, Sergeant Thomas Shields, Officer
Robert Ekstrom, Officer Keith Wells
and Officer Charles Peters, Defendants.

No. 87–CV–854.

United States District Court,
N.D. New York.

Sept. 28, 1993.

Oliver & Oliver, Albany, NY, for plaintiff; Lewis B. Oliver, of counsel.

Sullivan, Rehfuss, Cunningham & Brennan, Albany, NY, for defendant City of Albany; Stephen J. Rehfuss, of counsel.

Harvey and Harvey, Harvey & Mumford, Albany, NY, for defendant Aloisi; Brian F. Mumford, of counsel.

Roche, Corrigan, McCoy & Bush, Albany, NY, for defendant Shields; Robert P. Roche, of counsel.

Hinman, Straub, Pigors & Manning, Albany, NY, for defendant Ekstrom; Paul Collins, of counsel.

Steven W. Herrick, Albany, NY, for defendant Wells.

Ainsworth, Sullivan, Tracy, Knauf, Warner & Ruslander, Albany, NY, for defendant Peters; Joseph Teresi, of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### *INTRODUCTION*

Plaintiff Louise Thornton, in her capacity as the Administratrix of the Estate of Jessie Lee Davis, commenced this suit by filing a complaint against defendants City of Albany, Sergeant David Aloisi, Sergeant Thomas Shields, Officer Robert Ekstrom, Officer Keith Wells, and Officer Charles Peters on July 2, 1987. The events that form the basis for this suit occurred on July 8, 1984, at which time plaintiff's decedent was shot and killed by police officers of the Albany Police Department in his apartment at 60 Clinton Avenue, Albany, New York.

In her complaint, plaintiff alleges that defendants' actions on July 8, 1984, violated Mr. Davis' rights under the Fourth, Fifth, Eighth, Ninth, Tenth, Thirteenth and Fourteenth Amendments of the United States Constitution. More specifically, plaintiff alleges that defendants unreasonably seized Mr. Davis without probable cause and without a warrant, used excessive force to seize and detain him, and conspired to deprive him of his constitutional rights. Plaintiff invokes this court's jurisdiction pursuant to 42 U.S.C. §§ 1983, 1985, 1986, and 1988.

Presently before the court are Officer Peters' and Officer Ekstrom's motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. With respect to plaintiff's conspiracy claims, both Officer Peters and Officer Ekstrom assert that there is no evidence that they entered

into an agreement to violate Mr. Davis' constitutional rights. Furthermore, as to plaintiff's claims that defendants unlawfully seized Mr. Davis and used excessive force in carrying out this seizure, both officers contend that these claims should be dismissed as to them because they are shielded from suit for their actions by the doctrine of qualified immunity. Finally, both officers aver that plaintiff's claim for punitive damages should be dismissed because it is clear that they did not act with evil motive or intent. Plaintiff opposes these motions in their entirety.

### BACKGROUND

On July 8, 1984, officers of the Albany Police Department shot and killed Jessie Lee Davis in his apartment. According to plaintiff, at the time of his death, Mr. Davis had a history of mental illness. *See* Plaintiff's Memorandum of Law at 1. The events culminating in the shooting of Mr. Davis have been the subject of lengthy depositions of each of the defendant police officers.[1] As a result of its review of these depositions, the court has been able to compile the following facts about the incidents that occurred on July 8, 1984. Where differences in the officers' testimony is significant, the court has noted them.

At approximately 10:30 a.m. on July 8, 1984, Sergeant Aloisi and Officers Peters and Ekstrom responded to a Code 40 "Man Berserk" at 60 Clinton Avenue, Albany, New York. When Officer Ekstrom arrived, Sergeant Aloisi was talking to Mr. Paul Leahy and Ms. Velma Youmans.[2] *See* Ekstrom Deposition at 11; Aloisi Deposition at 29–30. Officer Ekstrom noticed broken glass on the sidewalk and porch area. *See* Ekstrom Deposition at 13. Shortly after Officer Ekstrom's arrival on the scene, Sergeant Aloisi told him that he had everything under control and that Officer Ekstrom could go back on patrol. *See id.* at 10, 12.

Ms. Velma Youmans complained to the police that the man on the third floor had been breaking windows out, and she wanted the police to go up and do something about it. *See* Peters Deposition at 14. Officer Peters looked up at the third floor and noticed that a window was broken. *See id.* at 15. He also noticed broken glass on the sidewalk. *See id.* at 16; Aloisi Deposition at 36. Ms. Youmans advised Sergeant Aloisi that there had been complaints about Mr. Davis during the preceding two weeks. *See* Aloisi Deposition at 31. She also expressed concern about the glass falling on her porch. *See id.* Sergeant Aloisi and Officer Peters went to the third floor and knocked on the door, but received no response. *See* Peters Deposition at 14; Aloisi Deposition at 32. Upon their return, they advised Ms. Youmans that no one appeared to be home. *See* Peters Deposition at 14. The officers then left the scene. *See id.;* Aloisi Deposition at 32.

Approximately one hour later, the police responded to a second Code 40 at the same address. *See* Peters Deposition at 26; Aloisi Deposition at 37. This time, Officer Ekstrom was the first one to arrive at the scene. *See* Ekstrom Deposition at 16. He exited his vehicle and crossed the street to talk with a man who was yelling at him. *See id.* That individual, Gary Becker, complained that Mr. Davis was hanging out of his window naked and throwing things out the window and that the police had to do something. *See id.* at 17. Officer Ekstrom looked across the street and noticed a broken window on the third floor. *See id.* at 18. He then asked Mr. Becker if he knew if Mr. Davis had any family members in the area because it would be easier to have the family talk to Mr. Davis if he had a problem. *See id.* at 20. Mr. Becker stated that he was not aware of any such family members. *See id.*

Officer Peters was the next to arrive. *See* Ekstrom Deposition at 23. He and Officer Ekstrom talked to Mr. Leahy who told Officer Ekstrom that he had called the Capital District Psychiatric Center ("CDPC") numer-

---

1. Some of these depositions spanned a number of days. Since the pages are sequentially numbered, however, the court has not cited the specific date on which the particular testimony was given.

2. In Sergeant Aloisi's deposition, this individual is referred to as Ms. Humans. It appears, however, that Ms. Youmans and Ms. Humans are the same person.

ous times and that CDPC had told him they were supposed to send a doctor over to check on Mr. Davis but never did. *See* Ekstrom Deposition at 24. While Officers Peters and Ekstrom were talking with Mr. Leahy, Sergeant Aloisi was talking to Ms. Lanier.[3] *See id.* at 33. Officer Ekstrom heard Ms. Lanier scream that her children's lives were in danger with stuff falling out of Mr. Davis' window and that the police had to do something to control Mr. Davis. *See id.* at 34.

After speaking with some neighbors, Sergeant Aloisi said "lets go inside." *See* Ekstrom Deposition at 43. He was accompanied by Sergeant Shields and Officers Peters and Ekstrom. *See id.* The four of them entered the building and proceeded to the second floor landing where they saw bricks on the landing and the stairway. *See id.;* Peters Deposition at 33; Aloisi Deposition at 69–70. Sergeant Aloisi testified that he had not seen either the glass or the bricks at the time he had responded to the earlier call. *See* Aloisi Deposition at 69–70. Officer Peters also noticed that a hallway window was broken on the third floor stairway. *See* Peters Deposition at 33. While they were on the second floor landing, Sergeant Aloisi identified himself as a police officer and asked Mr. Davis to come down and talk. *See* Ekstrom Deposition at 45–46; Peters Deposition at 46–47; Aloisi Deposition at 74–75. Mr. Davis replied that he could not come down because he was naked and they had taken his clothes. *See* Ekstrom Deposition at 46; Peters Deposition at 46; Shields Deposition at 5. Sergeant Aloisi then told Mr. Davis to put on some clothes and come downstairs to talk. *See* Ekstrom Deposition at 46; Peters Deposition at 46, 49. The officers then heard Mr. Davis go into his apartment and shut and lock the door. *See* Peters Deposition at 49–50; Aloisi Deposition at 75–76.

Sergeant Aloisi then sent Officer Ekstrom downstairs to see if anyone knew anything about Mr. Davis' family so that the police could contact somebody to talk to him.[4] *See* Ekstrom Deposition at 49. Officer Ekstrom knocked on the door of the first floor apartment. *See id.* at 50. From the porch, Ms. Lanier told Officer Ekstrom not to bother because the man in that apartment was always intoxicated and probably would not answer. *See id.* Officer Ekstrom then went to the porch and asked Ms. Lanier who lived in the basement. *See* Ekstrom Deposition at 50. He also asked Mr. Leahy if he knew anything about Mr. Davis' family. *See id.* Mr. Leahy responded no. *See id.* Ms. Lanier said she knew that Mr. Davis had a sister whom she thought might live in Arbor Hill but she was not sure. *See id.* Officer Ekstrom returned to the second floor landing and reported this information to Sergeant Aloisi. *See id.* at 51, 68; Aloisi Deposition at 83. At this point, the four policemen proceeded to the third floor landing. *See* Ekstrom Deposition at 68–69. While the officers were on the third floor landing, Officer Peters heard what sounded like someone banging on metal or pots and pans. *See* Peters Deposition at 50. At the same time, Officer Ekstrom heard Mr. Davis ranting and raving, pounding on pots and pans, talking about the devil and also heard glass breaking. *See* Ekstrom Deposition at 74–75; Aloisi Deposition at 81–82.

While the officers stood on the third floor landing, Sergeants Aloisi and Shields discussed the fact that because there was no family to be found they needed to enter Mr. Davis' apartment for his safety as well as the safety of the people on the street. *See* Ekstrom Deposition at 73–74; Aloisi Deposition at 85–86. Sergeant Aloisi knocked on Mr. Davis' apartment door. *See* Peters Deposition at 53; Aloisi Deposition at 77. At about that time, Officer Wells, who was positioned outside the building, radioed that Mr. Davis had climbed out the rear window of his apartment onto the roof and was armed with a large knife.[5] Sometime later, Officer Wells

---

**3.** At his deposition, Sergeant Aloisi testified that he did not remember having a conversation with Ms. Lanier at this particular time. *See* Aloisi Deposition at 53.

**4.** Sergeant Aloisi testified at his deposition that he sent Officer Ekstrom downstairs after the police were on the third floor landing. *See* Aloisi Deposition at 80.

**5.** Officer Wells testified that prior to this radio communication Mr. Davis had been climbing down the fire escape with a knife in his right

reported that Mr. Davis had gone back into his apartment. *See* Ekstrom Deposition at 78; Shields Deposition at 46.

After Sergeant Aloisi failed in his efforts to talk to Mr. Davis, he tried to force the door open with his shoulder but was unsuccessful.[6] *See* Peters Deposition at 58; Aloisi Deposition at 86, 89. Sergeant Shields obtained a sledge hammer from Mr. Leahy, *see* Shields Deposition at 7-8, which Sergeant Aloisi used to try to force the door open by breaking the lock. *See* Peters Deposition at 61; Shields Deposition at 17. He succeeded in making a hole in the door. *See* Peters Deposition at 61; Aloisi Deposition at 97. After making this hole, Sergeant Aloisi looked inside and told the other officers that he saw Mr. Davis running with a knife in his hands. *See* Ekstrom Deposition at 83; Peters Deposition at 61; Aloisi Deposition at 101-03. Sergeant Shields also looked through the hole and saw Mr. Davis holding a knife and other objects in his hands. *See* Shields Deposition at 18.

At this point, Sergeant Aloisi directed Officer Peters to go around to the rear of the building in case Mr. Davis came out the back. *See* Peters Deposition at 66, 77; Aloisi Deposition at 106. When he reached the rear of the building, Officer Peters saw Officer Hermanez in the backyard of 60 Clinton Avenue. *See* Peters Deposition at 70. Officer Hermanez told Officer Peters that Officer Wells had gone to the second floor roof. *See id.* at 71. Officer Peters then went up the fire escape to the second floor roof. *See id.*

When he arrived on the roof, Officer Peters saw Officer Wells squatting with his gun pointed in the direction of the bathroom window of Mr. Davis' apartment. *See id.* at 74. In addition, through an open window, Officer Peters saw Sergeant Aloisi standing inside the apartment with his gun drawn facing

east. *See id.* at 75. Due to the fact that the window was missing, Officer Peters felt that he would be in the line of fire if something happened in the apartment so he went to the western side of the window and positioned himself there. *See id.* at 75. While stationed on the roof, Officer Peters heard Sergeants Aloisi and Shields, as well as Officer Wells, call to Mr. Davis to put the knife down, to throw the knife on the floor, and to lie down on the floor. *See id.* at 83, 84. He could not, however, see at whom or at what either Officer Wells or Sergeant Aloisi were looking or at whom or at what they were pointing their guns. *See id.* at 87.

After Officer Peters left the third floor landing to secure the rear of the building, Sergeant Shields used the sledge hammer to break in the door to Mr. Davis' apartment. *See* Shields Deposition at 34-35; Aloisi Deposition at 104. Sergeant Aloisi was the first to enter the apartment with his gun drawn. *See* Ekstrom Deposition at 81-82; Aloisi Deposition at 109. He was followed by Sergeant Shields who also had his gun drawn. *See* Shields Deposition at 42. Sergeant Shields instructed Officer Ekstrom to remain in the hallway to watch the other doors to Mr. Davis' apartment. *See* Ekstrom Deposition at 82.

While Officer Ekstrom was in the hallway, he heard scratching on a second door to Mr. Davis' apartment. *See* Ekstrom Deposition at 87. This door, he later learned, was the door to Mr. Davis' bathroom. *See id.* at 85. Officer Ekstrom stated that the noise sounded like someone rubbing something against the wall or digging something into the wall. *See id.* at 87. In addition, Officer Ekstrom heard Mr. Davis mutter something about a .22—I have to get my brother's .22. *See id.* at 88. He went to the door of the apartment

hand pointed at Officer Wells. *See* Wells Deposition at 40. Officer Wells directed Mr. Davis to stop and drop the knife. *See id.* When Mr. Davis did not stop, Officer Wells drew his gun. *See id.* at 40-41. Mr. Davis then climbed up the fire escape to the roof and took off running. *See id.* at 40.

**6.** There is some question about how long Sergeant Aloisi talked with Mr. Davis before he made the decision to break down Mr. Davis'

apartment door. According to plaintiff, Sergeant Aloisi stated in his March 27, 1992, affidavit that he spent 15-20 minutes talking to Mr. Davis through Mr. Davis' locked apartment door before he decided to break down the door. *See* Oliver Affidavit, Exhibit B at ¶¶ 15-17. According to plaintiff, the police radio log establishes that this conversation could not have lasted for more than 3 minutes. *See* Plaintiff's Memorandum of Law at 2-3; Oliver Affidavit, Exhibit B.

through which the two sergeants had entered and told Sergeant Shields what he had heard. *See id.;* Aloisi Deposition at 123. Sergeant Shields told him to go back into the hall and watch the other two doors in case Mr. Davis attempted to exit through them. *See* Ekstrom Deposition at 88. At this time, Officer Ekstrom noticed that Sergeant Aloisi was near the door to the bedroom and Sergeant Shields was in the middle of the living room. *See* Ekstrom Deposition at 89. After he returned to the hall, Officer Ekstrom heard Sergeant Aloisi tell someone to drop his weapons and almost instantaneously he heard a shot go off. *See id.* at 90. He also heard Sergeant Aloisi tell someone twice to kick in a window, after which he heard glass break.[7] *See id.* at 91–92.

Sergeant Aloisi testified that prior to firing his first shot, Mr. Davis came running out of the bathroom at him with a knife in his right hand held high and something shiny in his left hand at waist level. *See* Aloisi Deposition at 123, 197. Sergeant Aloisi told Mr. Davis to drop it. *See id.* at 126. When Mr. Davis did not comply, he fired his weapon which was aimed at Mr. Davis' mid-section. *See id.* Mr. Davis then ran back into the bathroom. *See id.* at 127; 199.

After he heard the first shot, Officer Ekstrom went into the apartment because he was not sure who was shooting and he was concerned that some bullets would come through the doors into the hall. *See* Ekstrom Deposition at 95. Sergeant Aloisi told Officer Ekstrom that he was the one who had fired. *See id.* at 137. Sergeant Aloisi also told Sergeant Shields that Mr. Davis had charged him with a knife and that he had to shoot but he did not know whether he had hit Mr. Davis. *See* Shields Deposition at 62. Having fired the shot, Sergeant Aloisi proceeded into the bedroom, followed by Sergeant Shields and Officer Ekstrom. *See* Ekstrom Deposition at 96. Officer Ekstrom had his gun in his right hand and his baton in his left hand. *See id.* at 140. When they moved into the bedroom, Sergeant Aloisi positioned himself approximately 3–4 feet to

the right of the door and Sergeant Shields positioned himself to the left of the door. *See id.* at 97. Officer Ekstrom stayed behind Sergeant Shields but closer to the door. *See id.* Officer Ekstrom, who was facing the bathroom, saw Mr. Davis come out from the left side of the bathroom into the middle of the doorway moving in a slow manner. *See id.* at 105. Officer Ekstrom saw Mr. Davis with a knife in his right hand and a serving fork in his left hand. *See id.* at 107; Shields Deposition at 104; Aloisi Deposition at 251. At this time, according to Officer Ekstrom, Mr. Davis' hands were positioned in the middle of his body. *See* Ekstrom Deposition at 107. Sergeant Aloisi and Officer Ekstrom told Mr. Davis to get down on the floor, to lie down, and to drop his weapons. *See id.* at 107–08.

According to Officer Ekstrom, in response to Sergeant Aloisi's order, Mr. Davis got down on his knees. *See* Ekstrom Deposition at 110; Aloisi Deposition at 232–33. At that time, Officer Ekstrom saw Mr. Davis jab the knife into a tabletop with no legs located on the floor of the bathroom. *See* Ekstrom Deposition at 110–11; Shields Deposition at 99; Aloisi Deposition at 231. Mr. Davis then began to place his elbows on the floor. *See* Ekstrom Deposition at 110–11; Aloisi Deposition at 235. Next, Mr. Davis turned and grabbed the handle of the knife. *See* Ekstrom Deposition at 111; Aloisi Deposition at 256. At about this time, Sergeant Shields asked Officer Ekstrom to give him his nightstick, and Officer Ekstrom handed it to him. *See* Ekstrom Deposition at 115; Shields Deposition at 71, 106. Officer Ekstrom then put his gun in his holster. *See* Ekstrom Deposition at 116. He thought Sergeant Shields intended to physically restrain Mr. Davis, and Officer Ekstrom thought he could better assist him without the gun in his hand. *See* Ekstrom Deposition at 116; Shields Deposition at 71.

Sergeant Shields then moved to the head of the bed and climbed on it. *See* Ekstrom Deposition at 116; Shields Deposition at 106–07. He walked across the bed toward Mr.

---

**7.** At his deposition, Officer Ekstrom testified that he could not remember whether he heard Sergeant Aloisi tell someone to break the window before or after he heard the first shot. *See* Ekstrom Deposition at 87.

Davis. *See* Ekstrom Deposition at 116; Shields Deposition at 70, 107; Aloisi Deposition at 247. As Sergeant Shields put his foot on the end table next to the bed to balance himself, he knocked the lamp that was on the table onto the floor in front of Mr. Davis. *See* Ekstrom Deposition at 120; Shields Deposition at 108; Aloisi Deposition at 252–53. When the lamp fell, Mr. Davis started to jab the serving fork in and out of the lamp shade. *See* Ekstrom Deposition at 122. Mr. Davis then tried to start up from his position on his knees and elbows. *See id.* at 123. At this point, Sergeant Shields hit Mr. Davis across his shoulders and back with the nightstick. *See id.* at 123; Shields Deposition at 135; Aloisi Deposition at 256. Even after being struck, Mr. Davis again started to come up off the floor toward Sergeant Shields. *See* Ekstrom Deposition at 125. Mr. Davis had a knife in his right hand and other objects in his left hand. *See* Shields Deposition at 74–75. As Mr. Davis came toward him, Sergeant Shields began to back up, started to drop the nightstick, and drew his gun. *See* Shields Deposition at 135.

At the same time as these events were occurring in Mr. Davis' apartment, Officer Wells, who was on the roof outside Mr. Davis' bathroom window, looked through the window and saw Mr. Davis in a kneeling position, facing the bedroom. *See* Wells Deposition at 83–84. Officer Wells told Mr. Davis to lie face down on the floor. *See id.* at 101. After the third or fourth time, Mr. Davis did as he was instructed. *See id.* at 102. At this time, Officer Wells could see Sergeant Aloisi in the bedroom. *See id.* at 90. He could also see that Mr. Davis was holding a large fork in his left hand. *See id.* at 96. He could not, however, see Mr. Davis' right hand. *See id.* at 98. In addition, Officer Wells observed Sergeant Shields standing on the bed. *See* Wells Deposition at 110. He made eye contact with Sergeant Shields, they both nodded and thus understood that they intended to physically jump on Mr. Davis back. *See id.* at 111.

As Officer Wells was holstering his gun and pulling himself inside the window, Mr. Davis got up from his prone position, up to his hands and knees and started all the way up. *See id.* When Mr. Davis got halfway up, Sergeant Shields struck him with a nightstick across the back and shoulders. *See id.* As Mr. Davis began to stand, Officer Wells saw him turn and grab a knife off a table. *See id.* at 121. Mr. Davis held the knife in his right hand up over his head and the fork in his left hand and took off in a full run out the bathroom door. *See id.* At that point, Officer Wells, or somebody, hollered "Watch Out." *See id.* Then, Officer Wells fired twice, striking Mr. Davis in the side or lower back.[8] *See id.* at 122, 133. At the time he fired, Officer Wells thought it was necessary to do so to defend Sergeant Aloisi. *See id.* at 140. After he discharged his weapon, Officer Wells climbed through the window into the apartment to see if the other officers were safe. *See id.* at 137. At that time, he saw a knife in front of Mr. Davis on the floor. *See id.* at 148.

At the time Sergeant Aloisi shot Mr. Davis, Sergeant Aloisi thought that Mr. Davis had stabbed, or was about to stab, Sergeant Shields. *See* Aloisi Deposition at 265. Mr. Davis, however, was not standing erect. *See* Ekstrom Deposition at 178; Shields Deposition at 77; Aloisi Deposition at 263. At his deposition, Sergeant Shields testified that he saw a set of keys in a leather case in Mr. Davis' left hand. *See* Shields Deposition at 201. Sergeant Shields also recalled seeing a watch in the same hand. *See id.* at 202. In addition, Sergeant Shields testified that he remembered seeing a matchbox car on the table next to the bed but could not specifically recall it being in Mr. Davis' hand. *See id.* at 292. As Mr. Davis started to move in the direction of the bed, Sergeant Aloisi fired again. *See id.* Mr. Davis then turned toward Sergeant Aloisi in a singular upward movement, at which point Sergeant Aloisi fired, and Mr. Davis fell to the floor. *See* Ekstrom Deposition at 187; Shields Deposition at 154–55; Aloisi Deposition at 328, 331, 340. Sergeant Aloisi testified that at the

---

**8.** At his deposition, Officer Wells testified that at the time of the incident he thought that he had fired once. Later that afternoon, however, he learned that he had fired twice. *See* Wells Deposition at 134.

time he fired at Mr. Davis he feared for Sergeant Shields' safety and that part of the reason he fired was because he believed that Sergeant Shields' gun was unloaded.[9] *See* Aloisi Deposition at 342. He also testified that at that time Mr. Davis held the knife in his right hand and was standing on his feet and on his way to an upright position. *See id.* at 325.

During this time, Officer Peters was located on the roof outside Mr. Davis' apartment. He heard someone say watch out or look out and then heard shots fired. *See* Peters Deposition at 94, 98. He also observed Officer Wells discharge his weapon. *See id.* at 94. He looked into the apartment and saw Mr. Davis lying on the floor. *See id.* at 101. He also saw Sergeants Aloisi and Shields standing in the room. *See id.* In addition, Officer Peters saw a knife near Mr. Davis' head or around his body. *See id.* at 104. At that time, Sergeant Aloisi told Officer Peters to go around to the front of the building to secure it and await the arrival of the ambulance and the EMS Unit. *See id.* at 106.

Immediately after Mr. Davis fell to the floor, Sergeant Shields advised Officer Ekstrom to call the EMS Unit.[10] *See* Ekstrom Deposition at 188. When Officer Ekstrom returned to the front room of the apartment after calling the EMS Unit, Sergeant Shields advised him to go downstairs in the hallway to direct the EMS Unit to Mr. Davis' apartment when they arrived. *See id.* at 193. Officer Ekstrom did not go into the bedroom again that day. *See id.*

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. The mere existence of some alleged factual dispute, however, will not defeat such a motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211–12 (1986). Rather Rule 56 requires that there be no *genuine* issue of *material* fact. *Id.* at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211 (emphasis in original). Material facts are defined as those that might affect the outcome of the suit under the governing law. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of any genuine issues of material fact. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2510, 91 L.Ed.2d at 211. Once the moving party has met this burden, the burden shifts to the non-movant to demonstrate that there is a genuine issue of material fact. In this regard, the non-movant must do more "[t]han simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). "Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor." *Greenblatt v. Prescription Plan Servs. Corp.,* 783 F.Supp. 814, 819–20 (S.D.N.Y.1992) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (interpreting the "genuineness" requirement)).

Moreover, as a preliminary matter, the non-movant must "[m]ake a showing sufficient to establish the existence of [the] element[s] essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273

---

9. Sergeant Aloisi changed this testimony after having the question read back to him. He then answered "No. I fired because I thought he [Sergeant Shields] was *going to get stabbed."* *See* Aloisi Deposition at 342.

10. There appears to be some confusion about who actually called the ambulance and the EMS Unit. On the one hand, Officer Peters testified that Sergeant Aloisi told him to call the EMS Unit, which he did before leaving the second floor roof. *See* Peters Deposition at 110. Officer Ekstrom, however, testified that Sergeant Shields told him to call the EMS Unit.

(1986). If the non-movant fails to satisfy this initial burden, there can be no genuine issue as to any material fact because "[a] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552, 91 L.Ed.2d at 273. Under such circumstances, the moving party is entitled to judgment as a matter of law. *Id.*

■ Furthermore, for purposes of determining whether or not to grant summary judgment, the language of Rule 56 limits the information that the court may consider to the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file. In this regard, a movant's uncontested assertions in its 10(j) statement are deemed admitted for purposes of deciding whether summary judgment should be granted. *See* Local Rule 10(j); *see also Blackwelder v. Safnauer,* 689 F.Supp. 106, 112–13 n. 2 (N.D.N.Y.1988), *appeal dismissed,* 866 F.2d 548 (2d Cir.1989). In contrast, as one court in this circuit has stated

> [i]t is now well-settled that legal memoranda and oral argument are not evidence and "cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion where no dispute otherwise exists." *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 ( [9th Cir.] 1978)[, *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979) ]; *see also Transurface Carriers, Inc. v. Ford Motor Co.,* 738 F.2d 42, 46 (1st Cir.1984); *Watts v. United States,* 703 F.2d 346, 353 (9th Cir.1983).

*United States v. United States Currency in Amount of $23,481.00,* 740 F.Supp. 950, 955 (E.D.N.Y.1990). It is with these guidelines in mind that the court must analyze the facts of this case to determine whether or not Officer Ekstrom and Officer Peters are entitled to the relief they seek.

*II. Conspiracy Claims—42 U.S.C. §§ 1985(3), 1986*

■ Plaintiff asserts that defendants conspired to violate Mr. Davis' civil rights in contravention of 42 U.S.C. §§ 1985(3) and 1986. Section 1985(3) provides, in pertinent part, that

> [i]f two or more persons in any State ... conspire ..., for the purpose of depriving, either directly or indirectly, any person ... of the equal protection of the laws, or of equal privileges and immunities under the laws; ...; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (West 1981).

■ To establish a violation of § 1985(3), plaintiff must allege that (1) Mr. Davis was a member of a protected class; (2) defendants conspired to deprive Mr. Davis of his constitutional rights; (3) defendants acted with class-based invidiously discriminatory animus; and (4) Mr. Davis suffered injury as a result of defendants' actions. *New York State NOW v. Terry,* 886 F.2d 1339, 1358 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338, 348 (1971)). In the present case, there is no question that, as an African–American, Mr. Davis was a member of a protected class. Nor is there any doubt that Mr. Davis suffered an injury as a result of defendants' actions. What is in dispute, however, is whether plaintiff has satisfied the other two elements necessary to maintain her § 1985(3) cause of action.

Officer Peters contends that plaintiff's complaint fails to allege any specific factual allegations to support her conspiracy claim. *See* Peters' Memorandum of Law at 18. Furthermore, Officer Peters asserts that there is no direct or indirect evidence of any agreement among the defendants to establish a conspiracy nor is there any specific mention of specific acts committed by Officer Peters in furtherance of a conspiracy. *See id.* at 19. Likewise, Officer Ekstrom asserts

that plaintiff has failed to allege facts to support the existence of a conspiracy. *See* Ekstrom's Memorandum of Law at 14. In this regard, Officer Ekstrom avers that plaintiff has offered no factual basis for her allegation that defendants "[a]greed and conspired with each other and arrived at a plan to gain entry into the decedent's apartment and take the decedent into custody." *See id.* (citing Exhibit E, "Supplemental Answers to Defendants' First Set of Interrogatories, Answer No. 8").

To the contrary, plaintiff argues that she has demonstrated the existence of all the elements of her § 1985(3) claim. First of all, she asserts that there are questions of fact as to whether defendants engaged in a conspiracy, thus precluding this court from granting Officer Peters' and Officer Ekstrom's motions for summary judgment. *See* Plaintiff's Memorandum of Law at 24.[11] Without specifying which facts support her contention, plaintiff asserts that

> [t]here are facts from which the jury could draw the reasonable inference that the defendants agreed and had a plan to forcibly seize Davis from his apartment and take him into custody and that Peters and Ekstrom then acted in furtherance of that agreement by doing the conduct hereinbefore stated. The conduct of Peters and Ekstrom to seize Davis, is itself evidence from which a jury could infer that they were part of a plan to take Davis into custody. The repeated memory lapses of Peters and Ekstrom when asked if they had discussions with Aloisi and Shields as to entering Davis' apartment, are suspect and allow the inference that discussions in fact took place and that a plan was worked out. At issue is defendants' credibility which should be left for the jury to assess.

*See* Plaintiff's Memorandum of Law at 24.

The Second Circuit "[h]as recognized that certain claims are so easily made and can precipitate such protracted proceedings with such disruption of governmental functions that, despite the general rule of *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), detailed fact pleading is required to withstand a motion to dismiss." *Angola v. Civiletti*, 666 F.2d 1, 4 (2d Cir.1981). Therefore, the court has held repeatedly that "complaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed." *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir.1977) (citations omitted).

Having reviewed the record before it in light of this well-established standard, the court concludes that plaintiff's assertions constitute no more than conclusory, vague and general allegations of a conspiracy. Such allegations are not sufficient to establish the existence of an agreement among the defendants, the purpose of which was to deprive Mr. Davis of his constitutional rights. Thus, the court holds that plaintiff has failed to establish this essential element of her § 1985(3) cause of action.

■ Even if the court had concluded that plaintiff had demonstrated the existence of a conspiracy, she would still need to demonstrate that defendants acted with class-based discriminatory animus. As to this element of her claim, plaintiff argues that there is evidence of racial bias. *See* Plaintiff's Memorandum of Law at 24. In this regard, plaintiff asserts that

> Davis is a black man who was seized and killed by defendants in his home to which he had retreated for safety. The use of force was grossly excessive. It is reasonable for the jury to infer from the facts of the imprisonment and assault on Davis that defendants were motivated by an irra-

---

**11.** Plaintiff cites five cases to support her position that "[d]efendants' motion for summary dismissal as to allegations of conspiracy should be denied because there are questions of fact as to whether defendants engaged in a conspiracy." *See* Plaintiff's Memorandum of Law at 24 (citing *Snell v. Tunnell*, 920 F.2d 673 (10th Cir.1990); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988); *Earle v. Benoit*, 850 F.2d 836 (1st Cir. 1988); *Wahad v. FBI*, 813 F.Supp. 224 (S.D.N.Y. 1993); *Taylor v. Hansen*, 731 F.Supp. 72 (N.D.N.Y.1990)). Although all of these cases involve claims of conspiracy, each of them is factually distinguishable from the present action. Moreover, for purposes of the present motions, the holdings of these cases are dispositive only in so far as they stand for the general proposition that a court is precluded from granting a motion for summary judgment where a genuine issue of material fact exists.

tional racially based fear and failed to see Davis' humanity because of his color. *See id.* at 24.

The only evidence that plaintiff presents in support of this allegation is a portion of Sergeant Aloisi's Grand Jury testimony in which he stated "[h]is [Mr. Davis'] eyes were wide open and he looked like he had a grin on his face because at that time I remembered thinking, even if he gives up the weapon, he had a full set of teeth which could be weapons too." *See id.* at 25 (citing Grand Jury Report, p. 158).

With respect to the discriminatory animus element of a § 1985(3) claim, the Supreme Court has held that

> "[d]iscriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. *See United Jewish Organizations v. Carey,* 430 U.S. 144, 179, 97 S.Ct. 996, 1016, 51 L.Ed.2d 229 (concurring opinion) (footnote omitted) ... *It implies* that the *decisionmaker,* ... *selected or reaffirmed a particular course of action at least in part "because of,"* not merely *"in spite of,"* its adverse effects upon an identifiable group. (footnote omitted)

*Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (emphasis added).

Applying this law to the facts of this case, the court concludes that plaintiff has failed to demonstrate that the officers selected their course of action because of Mr. Davis' race. Plaintiff cannot seriously contend that Sergeant Aloisi's statement concerning his fear that Mr. Davis' "full set of teeth" could be used as weapons in any way indicates an invidious class-based animus toward African Americans as a group. As anyone who has been bitten by a small child, of any race, can readily attest—teeth can be used very effectively as weapons to attack another person or to protect oneself. Although the court is well-aware that it must draw all reasonable inferences in favor of plaintiff with respect to defendants' motions for summary judgment, it would be entirely unreasonable, as well as illogical, to conclude from Sergeant Aloisi's statement that he, or any of the other defendants, harbored the invidious discriminatory animus necessary to maintain a § 1985(3) claim. Having presented no other evidence to support this element of her claim, the court holds that plaintiff has failed to establish this essential element of her § 1985(3) cause of action upon which she would bear the burden of proof at trial.

Having found that plaintiff has failed to demonstrate either the existence of a conspiracy or the invidious discriminatory animus required to maintain her § 1985(3) cause of action, the court must conclude that plaintiff cannot withstand defendants' motions for summary judgment. *See Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273–74. Accordingly, the court grants Officer Peters' and Officer Ekstrom's motions for summary judgment with respect to plaintiff's § 1985(3) conspiracy cause of action and dismisses this claim with respect to these officers, in both their official and individual capacities, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

■ Having held that plaintiff's § 1985(3) cause of action must be dismissed, the court also must, *a fortiori,* dismiss plaintiff's § 1986 claim. Section 1986 provides, in pertinent part, that

> [e]very person who, having knowledge that *any of the wrongs conspired to be done, and mentioned in section 1985 of this title,* are about to be committed, and having power to prevent or aid in preventing the commission of the same neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; ... But *no action* under the provisions of this section *shall be sustained* which is *not commenced within one year after the cause has accrued.*

42 U.S.C. § 1986 (West 1981) (emphasis added).

In *Levy v. City of New York,* 726 F.Supp. 1446 (S.D.N.Y.1989), the court explained that § 1986 " 'merely gives a remedy for misprision of a violation of 42 U.S.C. § 1985.' " *Id.* at 1455 (quoting *Williams v. St. Joseph's Hosp.,* 629 F.2d 448, 452 (7th Cir.1980)).

Thus, "'[h]aving failed to state a cause of action under § 1985, plaintiff has also failed to state a claim under § 1986.'" *Id.* (quoting *Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir.), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2238, 56 L.Ed.2d 405 (1978)). Applying this law to the present case, it follows that having failed to state a § 1985(3) cause of action against Officers Peters and Ekstrom, plaintiff cannot maintain a § 1986 claim against these defendants. Accordingly, the court grants Officer Peters' and Officer Ekstrom's motions for summary judgment with respect to plaintiff's § 1986 claim and dismisses this cause of action as to these officers, in both their official and individual capacities, pursuant to Rule 56 of the Federal Rules of Civil Procedure.[12]

### III. Plaintiff's § 1983 Claims—Unreasonable Search and Seizure and Use of Excessive Force

Plaintiff contends that the officers' warrantless entry into Mr. Davis' home and his subsequent seizure violated his Fourth Amendment right to be free from unreasonable searches and seizures. Furthermore, plaintiff contends that the officers' use of force, including deadly force, in effecting the seizure of Mr. Davis violated his constitutional right not to be subjected to excessive force.

In response to these charges, Officers Peters and Ekstrom assert that they are protected from suit for their actions by the doctrine of qualified immunity. In this regard, Officer Peters asserts that at the time of the incident he possessed facts to support a reasonable belief that Mr. Davis was conducting himself in a manner likely to result in serious harm to himself or others. *See* Peters' Memorandum of Law at 14. Thus, Officer Peters argues that he had probable cause to participate in the entry into Mr. Davis' apartment building and the seizure of Mr. Davis. *See id.* Likewise, Officer Ekstrom contends that he is entitled to the protection of qualified immunity for his actions because the immediacy of the situation

required that Mr. Davis be subdued to ensure the safety of the other officers and private citizens. *See* Ekstrom's Memorandum of Law at 20. Moreover, Officer Ekstrom argues that under the uncertain and tense situation which existed at the time, it was objectively reasonable for him to believe that his actions did not violate Mr. Davis' Fourth Amendment rights. *See id.*

To the contrary, plaintiff argues that Officer Peters and Officer Ekstrom are not entitled to the protection of qualified immunity for two reasons. First of all, plaintiff asserts that in July 1984 the law was clearly established that only exigent circumstances would justify a warrantless entry into a person's home and that only reasonable force could be used to effect an otherwise legal seizure. *See* Plaintiff's Memorandum of Law at 7–11. In this regard, plaintiff avers that exigent circumstances did not exist and that the officers' use of deadly force was unreasonable. *See id.* Secondly, plaintiff contends that no reasonable officer could have believed that the seizure of Mr. Davis was legal under the Fourth Amendment. *See id.*

As the Second Circuit most recently stated in *Frank v. Relin,* 1 F.3d 1317 (2d Cir.1993),

> [i]n a § 1983 action, *qualified immunity shields a defendant official sued in his individual capacity* "from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), or, even where the rights were clearly established, if it was objectively reasonable for the official to believe that his acts did not violate those rights, *see Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987).

*Frank,* 1 F.3d at 1328 (emphasis added). The court went on to explain that "[i]n order to determine whether a particular right was

12. The court notes in passing that plaintiff arguably would be barred from maintaining her § 1986 claim by the statute's one year statute of limitations. In this regard, although plaintiff's

cause of action accrued on July 8, 1984, she did not file her suit until July 1987, well outside the applicable statute of limitations period.

clearly established at the time a defendant acted, a court should consider (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Frank*, 1 F.3d at 1328 (citing *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir.1993)).

■ Such immunity, of course, does not attach where the " 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Frank*, 1 F.3d at 1328 (quoting *Anderson v. Creighton*, 483 U.S. at 640, 107 S.Ct. at 3039; (other citations omitted)). Moreover, "[a]bsent extraordinary circumstances, if the law was clearly established, the defendant official is not entitled to summary judgment on his immunity defense 'since a reasonably competent public official should know the law governing his conduct.' " *Frank*, 1 F.3d at 1328 (quoting *Harlow v. Fitzgerald*, 457 U.S. at 819, 102 S.Ct. at 2738).

Despite this general proposition, however, the Second Circuit noted that "[e]ven where the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity *if it was objectively reasonable for him to believe that his acts did not violate those rights.*" *Frank*, 1 F.3d at 1328 (emphasis added) (citing *Malley v. Briggs*, 475 U.S. 335, 345–46, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986); *Robison v. Via*, 821 F.2d at 921). In this latter situation, however, "[t]he defense will turn on the particular facts, and summary judgment will be appropriate only if the defendant 'adduces sufficient facts [such] that no reasonable jury looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ] could conclude that it was objectively unreasonable for the defendant[s]' to believe that [they were] act-

ing in a fashion that did not clearly violate an established federally protected right." *Frank*, 1 F.3d at 1328 (citing *Halperin v. Kissinger*, 257 U.S.App.D.C. 35, 807 F.2d 180, 189 (D.C.Cir.1986) (Scalia, J., sitting by designation); *Robison v. Via*, 821 F.2d at 921)).

The present case fits squarely within this latter category. No one disputes the fact that in July 1984 the contours of Mr. Davis' rights to be free from unreasonable searches and seizures and the use of excessive force were clearly established and that the officers' permissible actions with respect to these rights were clearly delineated. Thus, Officers Peters and Ekstrom are entitled to summary judgment based upon their defense of qualified immunity *only* if they present the court with sufficient evidence to warrant a finding that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, plaintiff, could conclude that it was objectively unreasonable for them to believe that they were acting in a manner that did not clearly violate Mr. Davis' well-established federally protected rights.

### A. Excessive Force Claim

■ To establish a Fourth Amendment excessive force claim, a plaintiff must demonstrate that the force the officers used was, in light of the facts and circumstances confronting them, objectively unreasonable under the Fourth Amendment. *Finnegan v. Fountain*, 915 F.2d 817, 823 (2nd Cir.1990) (citing *Graham v. Connor*, 490 U.S. 386, 398–99, 109 S.Ct. 1865, 1873, 104 L.Ed.2d 443 (1989)). In making its determination as to the reasonableness of the force used, the court *must judge the defendants' actions "[f]rom the perspective of a reasonable officer on the scene"* and must take into account such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Finnegan*, 915 F.2d at 823 (emphasis added) (citing *Graham*, 490 U.S. at 398–99, 109 S.Ct. at 1873 (citations omitted)). Thus, for purposes of the present motions, the relevant

question for qualified immunity purposes is whether the actions of Officer Peters and Officer Ekstrom were objectively reasonable in light of the circumstances confronting them. *See, e.g., Finnegan,* 915 F.2d at 823; *Calamia v. City of New York,* 879 F.2d 1025, 1034 (2d Cir.1989); *Zuchel v. Spinharney,* 890 F.2d 273, 275 (10th Cir.1989).

▮ Officer Peters never entered Mr. Davis' apartment until after he was shot. Nor did he take part in forcibly gaining access to that apartment. At Sergeant Aloisi's instruction, Officer Peters went to the back of the apartment building. *See* Peters Deposition at 66, 77. Subsequently, he climbed the fire escape and positioned himself on the second story roof outside Mr. Davis' apartment. *See id.* While on the roof, Officer Peters observed Officer Wells point his gun in the direction of a window of Mr. Davis' apartment and also heard Sergeants Aloisi and Shields, as well as Officer Wells, repeatedly say "drop the knife" and "get on the floor." *See id.* at 74, 83, 84. Officer Peters, however, could not see at whom or at what Officer Wells and Sergeant Aloisi were looking or pointing their guns. *See id.* at 87. There is no evidence that Officer Peters ever interacted with, spoke to, saw, or pointed or fired his gun at Mr. Davis.

Arguably, Officer Ekstrom's interaction with Mr. Davis was greater than that of Officer Peters. Officer Ekstrom, like Officer Peters, took no part in forcibly gaining entry to Mr. Davis' apartment. Once Sergeants Aloisi and Shields entered Mr. Davis' apartment, Officer Ekstrom was stationed in the hallway to guard against Mr. Davis' escape through two other doors which also led to his apartment. *See* Ekstrom Deposition at 82. Subsequently he entered Mr. Davis' apartment twice. On the first occasion, he went to the door of the apartment to tell Sergeant Shields that he had heard Mr. Davis mumble something about a .22. *See id.* at 88. The second time, Officer Ekstrom entered Mr. Davis' apartment after he heard a shot fired. *See id.* at 95. At that time, he had his gun in one hand and his baton in the other. *See id.* at 140. There is no evidence, however, that he ever pointed his gun at Mr. Davis. Shortly after entering the apartment, he holstered his gun and handed his baton to Sergeant Shields, as requested. *See id.* at 115–116. Thereafter, although present in the room with the other officers, he had no interaction with Mr. Davis.

Although plaintiff offers no affirmative evidence to controvert these facts, she still maintains that Officers Peters and Ekstrom are not entitled to qualified immunity with respect to her excessive force claim. Plaintiff, however, has cited no factually similar case in which a court has held that such minimal force as that allegedly used by Officers Peters and Ekstrom was excessive. Alternatively, to the extent that plaintiff's argument is based upon her assertion that because Officers Peters and Ekstrom were present when the other officers allegedly used excessive force to seize Mr. Davis they are not entitled to summary dismissal of this claim based upon the defense of qualified immunity, the court must disagree. In numerous cases involving multiple defendants accused of using excessive force, courts have granted summary judgment in favor of those defendants, who, although present, did not actually apply the excessive force charged. *See, e.g., Robison v. Via,* 821 F.2d 913, 923 (2d Cir.1987); *Mazurkiewicz v. New York City Transit Authority,* 810 F.Supp. 563 (S.D.N.Y.1993); *Medlin v. City of New York,* No. CV–89–1442, 1990 WL 186232, 1990 U.S. Dist. LEXIS 15779 (E.D.N.Y. Nov. 20, 1990).[13]

---

**13.** To the extent that plaintiff relies upon *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553 (1st Cir.1989), to support this position, such reliance is misplaced. In *Gutierrez–Rodriguez,* the plaintiff sued four police officers under § 1983 for depriving him of his constitutional right of liberty without due process of law. The jury returned a substantial verdict in favor of the plaintiff and the defendants appealed. The court in *Gutierrez–Rodriguez* never addresses the issue of the applicability of the defense of qualified immunity to this claim. Nor is there any indication that the officers ever raised this defense to their liability.

Plaintiff cites *Gutierrez–Rodriguez* for the proposition that, despite their allegedly minor roles in the incidents leading to Mr. Davis' injuries, they are liable nonetheless for his death. Certainly *Gutierrez–Rodriguez* stands for this proposition. The issue for purposes of the present motions, however, is not Officers Peters' and Ekstrom's liability. Rather, the issue presently before the court is whether, despite this alleged liability, the

In conclusion, applying the applicable law to the record before it, the court finds that the force that plaintiff attributes to Officers Peters and Ekstrom, is, as a matter of law, not excessive. Accordingly, the court grants Officer Peters' and Officer Ekstrom's motions for summary judgment as to plaintiff's excessive force claim and dismisses this claim with respect to these officers in their individual capacities based upon their defense of qualified immunity.

### B. Warrantless Search and Seizure Claim

▇▇▇ Officer Ekstrom argues that New York Mental Hygiene Law § 9.41 justifies his role in the warrantless entry into Mr. Davis' apartment and his subsequent seizure. *See* Ekstrom Memorandum of Law at 22. This statute provides, in pertinent part, that

> *[a]ny ... police officer* who is a member of ... an authorized police department or force ... *may take into custody any person who appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to himself or others.* "Likelihood to result in serious harm" shall mean (1) substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or (2) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm....

N.Y. Mental Hygiene Law § 9.41 (McKinney 1988) (emphasis added). To support his contention that Mr. Davis' behavior justified his warrantless seizure under the circumstances, Officer Ekstrom asserts, among other things, that he knew that Mr. Davis was armed with a knife, that he heard Mr. Davis mumble that he needed to get his brother's .22, and that he knew that Mr. Davis had been throwing objects out of a third story window onto the street. *See* Ekstrom's Memorandum of Law

at 22–23. Furthermore, Officer Ekstrom asserts that.

> [t]he decedent's behavior suggested that the decedent was dangerous to himself and to the civilians on the street who had been exposed to the debris and glass the decedent was throwing out of his window. His violent behavior put his neighbors, particularly Veronica Lanier and Paul Leahy, in reasonable fear of serious physical harm which fear they communicated to the officers on the scene.

*Id.* at 23.

Thus, based upon this information as well as New York Mental Hygiene Law § 9.41, Officer Ekstrom argues that a reasonable officer in his situation would have believed that entering the decedent's apartment to seize him was lawful. *Id.*

Officer Peters, likewise, relies upon New York Mental Hygiene Law § 9.41 to support his contention that his actions were reasonable under the circumstances. In this regard, Officer Peters asserts that

> [t]he flight of the decedent, stating that he was naked and his clothes were taken locking himself in the apartment; coupled with the unidentified voices, and strange sounds from the apartment created a question of safety for Jessie Davis, Officer Charles Peters and the public. That question could only be answered by knowing what person or persons were behind the apartment door and what their degree of safety was. Once a view through the door was obtained (using the sledge hammer), a person (not known at that time as Jessie Davis), was seen running to the rear of the apartment with a knife.

*See* Peters' Memorandum of Law at 15.

To the contrary, plaintiff asserts that "[n]o reasonable police officer could have believed in the legality of the warrantless entry into Davis' home because no reasonable police officer would have believed that Davis was an imminent threat to himself or anyone else." [14]

---

officers are immune from suit for their actions. The holding in *Gutierrez–Rodriguez* is of no help to the court in making this determination. Finally, the court notes that the same is true of the

holding in *Melear v. Spears*, 862 F.2d 1177 (5th Cir.1989), upon which plaintiff also relies.

**14.** Plaintiff attaches a footnote to this statement in which she asserts that "[a]lthough under the

*See* Plaintiff's Memorandum of Law at 13. In support of this contention, plaintiff argues that there is no evidence that Mr. Davis was in immediate danger of harming himself nor is there any evidence of suicidal behavior or talk. *Id.* at 12. Plaintiff also asserts that there is no evidence that Mr. Davis was doing anything that was an immediate threat to others' safety. *Id.* Plaintiff bases these assertions upon her contention that there is no evidence either that Mr. Davis left his apartment between the two Code 40 calls or that he threw anything out of the window after he retreated to his apartment. *Id.* Moreover, plaintiff argues that because there were no exigent circumstances, the officers should have obtained a warrant for Mr. Davis' seizure pursuant to New York Mental Hygiene Law § 9.43 if they believed that he was mentally ill. *See id.* at 8.

It is well-settled that the Fourth Amendment's warrant requirement must yield when exigent circumstances require that law enforcement officers act without delay. *United States v. Gordils,* 982 F.2d 64, 69 (2d Cir. 1992) (citing *Payton v. New York,* 445 U.S. 573, 585–86, 100 S.Ct. 1371, 1379–80, 63 L.Ed.2d 639 (1980)). " '[T]he test for determining whether a warrantless entry is justified by exigent circumstances is an objective one that turns on the district court's examination of the *totality of circumstances confronting law enforcement agents in the particular case.*' " *Gordils,* 982 F.2d at 69 (emphasis added) (quoting *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990) (en banc), *cert. denied,* 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991)). In making this determination, " '[t]he essential question ... is whether law enforcement agents were confronted by an "urgent need" to render aid or take action.' " *Gordils,* 982 F.2d at 69 (quoting *MacDonald* (quoting in turn *Dorman v. United States,* 435 F.2d 385, 391 (D.C.Cir.1970) (en banc))).

 In *Gordils,* the Second Circuit set forth the following six factors for courts to

use as guidelines for determining whether or not exigent circumstances exist:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*Gordils,* 982 F.2d at 69 (quoting *MacDonald,* 916 F.2d at 769–70 (quoting in turn *Dorman,* 435 F.2d at 392–93)).

The court noted, however, that these factors "[a]re merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive." *Gordils,* 982 F.2d at 69 (quoting *United States v. Medina,* 944 F.2d 60, 68 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992)). Therefore, under certain circumstances the presence of a solitary factor will suffice, while at other times it will require a combination of several of these factors. *United States v. MacDonald,* 916 F.2d 766, 770 (2d Cir.1990) (citing *United States v. Gallo–Roman,* 816 F.2d 76, 79–80 (2d Cir.1987) (single factor: destruction of evidence); *United States v. Callabrass,* 607 F.2d 559, 563–64 (2d Cir. 1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980) (combination of factors: destruction of evidence and danger to public)).

 Furthermore, even if the court were to find that a warrantless search was not supported by probable cause and exigent circumstances, it would not necessarily follow that the search was objectively legally unreasonable. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523, 531–32 (1987). As the Court noted in *Anderson,* it is "[i]nevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is [or exigent circumstances are] present, and

*Payton* case, there must be exigent circumstances to justify Davis' seizure and no reasonable police officer would have believed that the seizure was legal under that standard, in this case there was

not even probable cause and a reasonable officer would not have believed otherwise." *See* Plaintiff's Memorandum of Law at 13 n. 3.

we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40, 97 L.Ed.2d at 531–32 (citing *Malley,* 475 U.S. at 344–45, 106 S.Ct. at 1097–98).

Nonetheless, to be entitled to the protection of qualified immunity under these circumstances, the undisputed facts must demonstrate either "(a) that it was objectively reasonable for the officer to believe that probable cause existed, *or* (b) that officers of reasonable competence could disagree on whether the probable cause test was met." *Thomas v. Culberg,* 741 F.Supp. 77, 81 (S.D.N.Y.1990) (quoting *Robison,* 821 F.2d at 921 (citing in turn *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (emphasis added))). Thus, in the context of an unreasonable search and seizure claim, the relevant objective, albeit fact-specific, question, is "[w]hether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040, 97 L.Ed.2d at 531–32; *Washington Square Post # 1212 American Legion v. Maduro,* 907 F.2d 1288, 1292 (2nd Cir.1990). In other words, a court must assess the facts against the following objective standard: "[w]ould the *facts available to the officer at the moment of the seizure* or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry v. State of Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (emphasis added). Therefore, to justify a particular intrusion an officer must be able to "[p]oint to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. This does not mean, however, that the officer must rely solely upon his own personal observations. He " 'may rely upon information received through [a third party], rather than upon his direct observations, so long as the [third party's] statement is reasonably corroborated by other matters within the officer's knowledge.' " *Illinois v. Gates,* 462 U.S. 213, 242,

103 S.Ct. 2317, 2334, 76 L.Ed.2d 527, 550 (1983) (quoting *Jones v. United States,* 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960)); *see also Daniels v. United States,* 393 F.2d 359 (D.C.Cir.1968).

Applying this law to the record before it, the court is convinced that given the information available to Officers Peters and Ekstrom on July 8, 1984, it was reasonable for them to believe that Mr. Davis was mentally ill and was acting in a manner that was likely to cause imminent danger to himself and to others. For example, the officers observed bricks on the landing and the stairway in the apartment building. *See* Ekstrom Deposition at 43; Peters Deposition at 33; Aloisi Deposition at 69–70. They also noticed that a third floor hallway window was broken. *See* Peters Deposition at 33. In addition, while standing outside Mr. Davis' apartment, the officers heard strange noises, banging on metallic objects, talk about the devil, and breaking glass. *See* Peters Deposition at 50; Ekstrom Deposition at 74–75; Aloisi Deposition at 81–82. These facts coupled with the Ms. Lanier's complaint that her children's lives were in danger from objects falling out of Mr. Davis' windows certainly provided a sufficient basis from which a reasonable officer could have believed that a warrantless entry into Mr. Davis' apartment and his subsequent seizure were reasonable. Furthermore, when this information is coupled with New York Mental Hygiene Law § 9.41, it was reasonable for the officers to believe that they had probable cause to take Mr. Davis into custody. *See Maag v. Wessler,* 960 F.2d 773 (9th Cir.1991).

In addition, defendants have presented affirmative evidence as to the existence of several of the *Gordils* factors that amply support a finding that exigent circumstances existed at the time that they conducted their warrantless search and seizure. First of all, Officers Peters and Ekstrom had been told by their fellow officers that Mr. Davis was armed with a knife. *See* Ekstrom Deposition at 78, 83; Peters Deposition at 61. Furthermore, having heard Mr. Davis run into his apartment and lock his door, coupled with the strange sounds they heard inside Mr. Davis' apartment thereafter, Officers Peters

and Ekstrom had a strong basis for their belief that Mr. Davis was in his apartment. *See* Peters Deposition at 49–50; Ekstrom Deposition at 74–75. Finally, given the fact that Officer Wells had reported to them that Mr. Davis had climbed out his window onto the roof and then later climbed back in through a window, it was reasonable for Officers Peters and Ekstrom to believe that Mr. Davis might attempt to escape in the same manner if not prevented from doing so. *See* Ekstrom Deposition at 78.

Plaintiff offers no affirmative evidence to contradict these facts. Instead, she relies solely upon the lack of other evidence to support her conclusory assertion that exigent circumstances did not exist. Such conclusory allegations and denials, however, are insufficient to raise a genuine issue of material fact with respect to the reasonableness of Officers Peters' and Ekstrom's perceptions concerning the information available to them and the conclusions they drew from these observations, resulting in their decision to participate in the warrantless entry into Mr. Davis' apartment and the attempt to take him into custody. Accordingly, the court grants Officer Peters' and Officer Ekstrom's motions for summary judgment as to plaintiff's Fourth Amendment "unreasonable search and seizure" claim and dismisses this claim with respect to these officers in their individual capacities based upon their defense of qualified immunity.

### CONCLUSION

Having failed to establish the essential elements of her conspiracy claim, plaintiff's cause of action based upon 42 U.S.C. § 1985(3) is dismissed as to Officers Peters and Ekstrom in both their official and their individual capacities. Furthermore, because plaintiff failed to state a claim pursuant to § 1985(3), she cannot maintain a conspiracy claim pursuant to 42 U.S.C. § 1986. Thus, the court dismisses this cause of action as to Officers Peters and Ekstrom in both their official and their individual capacities.

 With respect to plaintiff's Fourth Amendment causes of action based upon her claims of unreasonable search and seizure and the use of excessive force, the court finds that the actions of Officers Peters and Ekstrom were reasonable under the circumstances that confronted them at that time. Therefore, they are protected from suit for their actions pursuant to the doctrine of qualified immunity. Accordingly, the court grants Officers Peters' and Ekstrom's motions for summary judgment with respect to these claims in their individual capacities. The court notes, however, that the defense of qualified immunity is only applicable to suits against government officials in their individual capacities. *See Cartier v. Lussier*, 955 F.2d 841, 844 (2d Cir.1992). Thus, Officers Peters and Ekstrom remain defendants in this case with respect to these claims in their official capacities. Finally, having dismissed plaintiff's Fourth Amendment claims against Officers Peters and Ekstrom in their individual capacities, the court must also dismiss plaintiff's claim for punitive damages against these defendants.

IT IS SO ORDERED.